O. F. CLARK v. THE WILMINGTON AND WELDON RAILROAD
COMPANY.

*Common Carriers—Negligence—Proximate Cause—Evidence—
Jury, Province of — Conduct of Trial.*

Where a locomotive engineer could see the track from his place upon the
engine for a distance of a mile in front, and plaintiff's intestate
was killed on a trestle 125 feet long and from 8 to 11 feet high,
with a mile-post at the north end nearest the approaching train,
and there was testimony tending to show that a *very active* man
might have escaped the train by jumping upon a cap, but there
was conflicting evidence as to the questions; (1) whether the alarm
signal was given at a distance of 450, 150 or 100 yards from the
trestle; (2) whether the plaintiff's intestate stepped upon the tres-
tle when the engine was 450, 50 or 40 yards from it; (3) whether
the train was running at a speed of 35 or 50 miles an hour; (4)
whether the train could have been stopped by the engineer in 450
or 100 yards; (5) whether the engineer applied brakes and attempted
to stop the train at a distance of 40 or 50 yards from the trestle, or
did not diminish speed till deceased was stricken; (6) whether the
train was stopped in 50 or 200 to 250 yards after intestate was
stricken, near the south end of the trestle and thrown 25 yards
beyond it; (7) whether deceased might have jumped to the ground
without danger of injury, and would have landed on stone, sand
or mud, if he had jumped off: *Held*—

1. That it was not error to submit the case to the jury to determine
whether, notwithstanding the negligence of plaintiff's intestate,
the defendant's train could have been stopped without peril to the
passengers and property being transported on it, in time to have
averted the injury entirely, or to have prevented its fatal conse-
quences, after the engineer could, by proper watchfulness, have
discovered that intestate was walking upon the trestle in his front.

2. While, as a general rule, the engineer would have the right to assume
that a person walking upon the track was in possession of all his
faculties, yet, where the conduct of the traveller is such as to
excite a doubt of this, the engineer is bound to use greater cau-
tion and to stop the train, if necessary to secure his safety.

3. When an engineer sees, or can by proper watchfulness, discover that
a traveller has placed himself in peril on a trestle or bridge, he
should act upon the supposition that the person may be drunk or

bereft of reason from sudden terror, and use all of the means at his command, consistent with safety, to diminish the speed of his train.

4. It is the province of the jury, in the exercise of reason and common sense, either by the aid of, or without expert testimony, to determine within what distance a train might have been stopped under any given circumstances.

5. Where the original wrong only became injurious in consequence of the intervention of some wrongful act or omission by another, the injury should be imputed to the last wrong, as the proximate cause or *causa causans*, and not to that which is more remote.

6. It is not material how short an interval occurs between the negligent act of the plaintiff and that of the defendant, if the latter had time to discover the danger and avert it by the exercise of ordinary care.

7. If, after plaintiff's intestate went upon the trestle, the defendant's servant could, by proper watchfulness, have discovered his danger in time to avert it, without jeopardy to the persons or property on the train, and neglected to do so, the negligence of the two was not concurrent or cotemporaneous.

8. It was not error in the Court to recapitulate fairly such contentions of counsel as illustrated the bearing of the evidence upon the issues.

CLARK and DAVIS, JJ., dissenting.

This was a CIVIL ACTION, tried at August Term, 1891, of JOHNSTON County Superior Court, before *Whitaker, J.*

The following issues were submitted to the jury:

1. Was J. M. Clark killed by the negligent running of defendant's engine?

2 Was there contributory negligence on his part?

3. After said J. M. Clark put himself in peril, might the killing have been avoided by the exercise of proper care and prudence on the part of defendant company's engineer?

4. What damage, if any, is plaintiff entitled to recover?

The jury answered each of the first three issues (1, 2 and 3), "Yes," and the fourth issue, "$1,250."

The following is the material evidence in the case:

Jackson Lassiter, for plaintiff: "I am acquainted with the place where the plaintiff's intestate was killed. The

trestle is about one hundred and twenty-five feet long. Judging from my knowledge of the situation, acquired by the examination of the locality after the accident, plaintiff's intestate was knocked by engine twenty-five or thirty yards. I heard the train blow—give the danger signal; might have blown several times more; when I looked the train was 450 yards from the trestle. This was a passenger train, a little behind time. A train with air-brakes can be stopped in 150 yards. When the train reached the trestle I could see no diminution of speed. Train stopped pretty soon after it got over the trestle, and was, at time of blowing, travelling at rate of thirty or thirty-five miles an hour. This trestle had been used by the public as a foot-way for seventeen or eighteen years. When I got to the trestle plaintiff's intestate was dead. The accident was a little past 2 o'clock P. M. A person might have gotton on a cap of the trestle and have avoided being run over, if he was pretty active." The witness then introduced diagram of the trestle and locality of the killing which he swore was correct, showing that Clark was struck near the south end of the trestle, and that his body was knocked by the engine about twenty-five yards beyond the south end of the trestle and down the embankment, and showing that when the engine blew the alarm it was 450 yards from the north end of the trestle.

*Cross-examined.*—" A long grade there. A man on trestle could have been seen by engineer a mile, and a person on the trestle might have seen the train the same distance."

J. D. Moore, for plaintiff: " I heard the train blow; looked and saw a man on the trestle—five or six yards on it. The train blew as it does when stock is on the track. When the train blew it was 450 yards from the trestle. I could see no slack-up of the train. It was running at least thirty-five miles an hour. Train ran one hundred yards over and beyond trestle before it stopped. The stream runs under the trestle, and is six or eight feet wide; trestle 125 feet long;

rock on each side trestle on the ground south of stream. Engineer could see man on trestle mile off; cannot tell how near he would have to get to trestle before he would know the man was on the trestle."

Jackson Lassiter, re-called: "The engineer could tell man was on the trestle four or five hundred yards off. There was a mile-post at north end of trestle."

Mrs. O. E. Clark: "The intestate was forty-nine or fifty years old. He was partly deaf in one ear; he was lame in one ankle and limped."

John W. Snipes: "I am acquainted with intestate of plaintiff; he made about one hundred dollars per year, free from board."

James W. Morris, for defendant: "Am agent of the Atlantic Coast Line. The general character of Thomas McMillan, as an engineer and as a man, is good. Engineer could not tell, with train running forty-five miles an hour, whether man was on trestle or other part of track more than about 125 yards, if the man was just entering the trestle. Train running forty-five miles an hour could be stopped in 450 or 500 yards."

Thomas McMillan: "I have been an engineer sixteen or seventeen years on the Wilmington and Weldon Railroad. I was engineer on this train (No. 23), bound south; behind time thirty minutes, running forty-five to fifty miles an hour; seven coaches, two of which were sleepers. I was in my proper position, sitting on the right-hand side of the engine. Clark was killed on the trestle of Old Town Creek at foot of hill, going down grade for a fraction over a mile; grade twenty-five feet to the mile. I was keeping a lookout ahead; saw Clark first, about three-quarters of a mile off, walking on outside right-hand side of track. When I got within about one hundred yards of him I saw that he had not noticed the appraching train. I blew a distinct road-crossing signal (two long and two short blasts of the whistle); the

fireman, at the same time, rang the bell. I did this as a warning to him that a train was approaching from the rear. He acknowledged that by stopping and looking back at the train. He then turned and went towards the trestle, still on the outside of the track. If he had staid where he was I could have passed him with safety to himself. When I got within forty or fifty yards of him he had arrived at a point at or near the north end of the trestle; he stepped upon the track directly in front of the engine; attempted to trot or run across the trestle. When he stepped upon the track I shut off steam and applied the brakes; then I blew the danger whistle. When he had run twelve or fifteen feet on the trestle, the engine struck him. Train had the latest improved and best automatic brakes. As soon as possible, after applying brakes, I reversed the engine. After I applied brakes train ran about 400 yards. He might have walked down off the embankment where he was when he looked back at the engine, and also at the end of the culvert. I had no reason to believe from any action of Clark's that he was going to attempt to cross the trestle; I thought he would keep out of the way of the train. The highest point of the trestle is eleven feet; on the north side of stream trestle is only seven or eight feet high."

*Cross-examined.*—" When Clark stepped on track engine was in forty or fifty yards of him. A verdict against the railroad in this case would not cause me to lose my place; the railroad does not discharge its employees because of verdicts of juries. It would not, however, retain in its employ a negligent or careless engineer "

L. B. Tillery: " Train running at thirty-five miles could be stopped in about 300 yards running; as that train was running, could be stopped in between 400 or 500 yards; I cannot be strictly accurate as to the distance."

Mack Jones: " I was fireman on this train; when I first saw Clark he was on right-hand side of track; if he had staid

there he would not have been hurt; I first saw him about half a mile off; when in a hundred yards engineer gave the alarm; when we went on trestle we were in thirty or forty yards of him. Train stopped in 200 or 250 yards from where Clark was struck. He had two ticklers; been in service of defendant six or seven years. Train running between forty-five and fifty miles an hour."

John Cotton: "I was passenger on train, standing on front of second-class car looking ahead. I saw the man walking alongside of the track; heard the whistle blow, and saw the man when he turned around and then proceeded walking. Felt the brakes applied; heard the short blasts of the whistle."

George Ricks: "I was a track hand, and was then at work about two hundred yards from the south end of the trestle; I heard the whistle blow—train was then coming on the north side of the trestle; I cannot give any idea of the distance the train was from the north end of the trestle when the whistle blew; when the whistle blew I looked up, and James M. Clark was on the trestle and was running in the direction of me, which was south. It was the evening mail, southward bound. He was in the middle of the track of the trestle, running, when I saw him; he had a small valise on his back; he kept running till the train struck him. I had seen him, before the whistle blew, coming towards the trestle, and he was walking on gravel-walk by the side of the track at the end of the cross-ties; my attention was not again directed towards him until I heard the whistle. On the north side of the trestle, the road is straight for two and a half miles. The engineer could see a man on the trestle for one mile. I cannot say that the train slowed up any before it struck him; a man standing in front of train cannot tell whether it is slowing up or not. It didn't run but mighty little ways after it struck him before it stopped. He fell on the east side of the track, where I saw him. It knocked him up, and he fell over on the east side; I do not

know how far he fell from the place he was struck. The train stopped in about fifty yards from the south end of the trestle after striking Mr. Clark. The trestle is a regular passway for people, anybody crosses that wants to."

*Cross-examined.*—" There is a private crossing about one-fourth of a mile north of the trestle, on which Clark was killed. The engineer blew at the land-bridge crossing, one mile north of trestle. Mr. Clark was then on the gravel-walk at the end of cross-ties. If Mr. Clark had kept on the gravel-walk he would have been safe. He kept on the gravel-walk till he got to the trestle. At that time a man could have gone down and crossed the creek dry-footed. A man could, with safety, have jumped to the ground—it was sand bottom; at the north end of trestle, could have gone down embankment with all ease. When I first saw him, he was walking alongside the road, like any other man. He appeared to be sober and in his right mind; when I first saw him on the trestle he was running, and the whistle was blowing and the bell ringing, and continued to blow and ring until the train struck him; engine ran about fifty yards after train struck the deceased. Coming towards Town creek from the north is down-grade for a mile. There was nothing to hinder Mr. Clark from seeing the coming train; it was a still day; could hear the train roaring a mile that day."

By consent of the plaintiff, the second issue was answered "Yes."

The defendant excepted to the admission of none of the foregoing evidence, nor to the exclusion of any evidence.

The defendant offered no prayer for instructions.

After the verdict of the jury assessing the damage at $1,250, the defendant moved for a new trial, on the ground that the verdict was not sustained by the foregoing evidence. The defendant also moved for a new trial upon the ground that his Honor, in recapitulating the evidence, stated that it

was contended by counsel for the plaintiff that McMillan, the engineer, ought not to be believed, because if he came on the stand and should admit such statement of facts as would warrant a verdict for plaintiff, he, McMillan, would lose his place, and that his Honor did not recite the opposite contention of counsel for defendant.

His Honor recapitulated the various contentions of the counsel on both sides fully to the jury, and, in calling attention of the jury to the various contentions of the counsel, stated: "It was contended by counsel for plaintiff that the engineer ought not to be believed, because if he were to admit such statement of facts as would warrant a verdict for plaintiff it would be a moral confession of manslaughter, and that he would probably lose his place; that it was contended by counsel for the defendant that McMillan, the engineer, was a man of good character, both as a man and as an engineer, as testified to by various witnesses; that an engineer of his character and reputation would not run his engine recklessly so as to kill a human being, and that he would not lose his position with the defendant company, no matter what the verdict of the jury was; and that railroad companies did not discharge employees on account of the verdict of juries, for they would lose their best officers if they did so." His Honor charged, among other things, that these were contentions of counsel; that it was his duty to call attention of the jury to the contentions; that it was their duty to consider the same, and in weighing the testimony of the various witnesses examined, to consider what interest, if any, the witness had in the matter.

Motion for new trial overruled; judgment; appeal.

*Mr. J. H. Pou,* for plaintiff.
*Mr. W. C. Munroe,* for defendant.

AVERY, J.: The main question presented by the statement of the case on appeal, and ably and elaborately argued by the counsel on both sides, was whether, in any phase of the testimony, the Court should have permitted the jury to pass upon the issues involving the question of defendant's negligence. The plaintiff contends that there was ample evidence to warrant the findings of the jury, in response to the first issue, that his intestate was killed by the negligent running of the defendant's train, and, in response to the third issue, that notwithstanding the negligence of his intestate, the injury might have been avoided by the exercise of proper care and prudence on the part of the defendant company's engineer. The defendant assigned as error the failure of the Court to instruct the jury that there was not sufficient evidence to justify an affirmative response to said issues. So that if a collocation of detached portions of the testimony would *prima facie* tend to show that the engineer was negligent, and that, by such precaution as a man of ordinary prudence would have taken, he could have prevented the collision, it was the duty of the Court to submit the issues to the jury, and they were justified, in the exercise of their exclusive right, in responding to them as they did. *Sherndon* v. *Brooklyn, &c.,* 36 N. C., 39; *Kenyon* v. *Railroad,* 3 Hun., 481. The engineer, according to the testimony of all the witnesses, could see the trestle on which the intestate was killed for a mile before he reached it. George Ricks, a witness for the defendant, deposed that the train approached from the north; Jackson Lassiter, a witness for the plaintiff, testified that there was a mile-post at the north end of the trestle, and that the engineer going south could tell that a man was on the trestle when his engine was four or five hundred yards distant from it; that the plaintiff's intestate was stricken by the engine near the south end of the trestle, which was 125 feet long, and thrown about twenty-five yards south of it and down an embankment; that the train

could have been stopped within 150 yards, and that the witness looked when the danger signal was given and the train was then 450 yards from the trestle, but the witness looking at it could see no diminution of its speed when it reached the trestle; just as the witness Moore stated that he could see no "slack up" of the train till it reached the trestle. George Ricks, deposing in behalf of the defendant, could not say that the train "slowed up" any before it struck decedent, though he could see its approach distinctly, and that said decedent was running in the middle of the track, when he first saw him, just after the whistle blew.

The defendant's engineer testified that when the signal was given, at a distance of one hundred yards, the plaintiff's intestate acknowledged it by stopping and looking back at the engine; that he was still north of the trestle, had not reached it but turned and went towards the trestle, still on the outside of the track, and when the engine was fifty yards north of the trestle he stepped upon the track at or near the north end of it for the first time; that he then applied the brakes but struck deceased ten or twelve feet from the north end. The defendant's fireman thought the train was not stopped for 200 to 250 yards beyond where Clark was stricken, while he thought the alarm was given 100 yards north of the trestle. The intestate began to run, according to Ricks' statement, along the middle of the track on the trestle when the signal was blown. There was testimony to the effect that the frame of the trestle was from eight to eleven feet above the ground, and that a very active man might have escaped injury by jumping upon a cap.

The jury were not bound to find that the whole of the testimony of any witness was true, and it is immaterial whether they thought any given one was mistaken as to his recollection or observation of some matters, and accurate as to other facts, or was false in part and credible as to other statements. Any one of several theories arising out of the evidence may

have been adopted by the jury. They may have concluded that Lassiter was to be believed when he stated that Clark was killed at the south end of the trestle, after the engine had traversed its whole length, and not near the north end, as the engineer stated; and that theory may have been strengthened by finding it to be true that the intestate was thrown up into the air, and at the same time received such an impetus forward as to land his body twenty-five yards further at the side of the embankment. They had a right to conclude from the evidence, which we have stated, that deceased was on the trestle in the middle of the track when the whistle blew and the bell rang, and they had testimony sufficient to warrant the belief that at that very moment the engine was 450 yards from the trestle, and could have been stopped in 150 yards. The jury were justified in concluding, as a fact, that the engineer did not, as a witness testified, perceptibly slacken his speed in the least till he struck Clark, and this theory would be sustained by defendant's own testimony (that of the fireman, Jones), that the train ran on 200 to 250 yards after striking him before it was fully stopped, while it could have been brought to a standstill within 150 yards (according to the evidence of Lassiter, which the jury had a right certainly to believe), as they had a right to fix a lower estimate as the true one.

If the foregoing is a fair summary of the facts, that the jury might have found as a part of a special verdict, then we may assume, for our present purpose, that any theory arising out of it is a true embodiment of their finding. Suppose the engineer saw the plaintiff's intestate, after looking back in acknowledgment of the danger signal, rushing along the middle of a trestle 125 feet long, with no means of escape till he should reach the south end of it, except by jumping eleven feet (the height on the south side) to the ground, or the display of unusual activity by jumping upon a cap, and that he ran his engine three hundred yards while Clark was

still running along the centre of the track on the trestle, he could have stopped it within the remaining 150 yards, if not sooner, before even reaching the north end of the trestle. But, when there was no longer any doubt that intestate was fully committed to risking his life in the effort to cross, because of his persistent movement south on the track, while the engine advanced 300 yards after the signal was given, the engineer rushed recklessly onward without the slightest diminution of speed. But if, by any calculation as to the relative progress of two bodies in motion on the same road, the jury concluded that the train was nearer to the trestle when the alarm was given, there is no possible method by which we can legitimately tell whether they fixed that distance at 450, 150, 100 or 50 yards. If it was 150 yards, and Lassiter was to be believed, then the engineer could (after the deceased made his purpose apparent by looking at the engine and then moving forward) have stopped at the very northern extremity, or if they thought 100 yards was the distance, as the engineer testified, the engine would have been brought down to a slow pace and within nine yards of a full stop when it came in contact with intestate, so that the force of the collision might not have been sufficient to do him serious injury if he was stricken at the south end of the trestle. Suppose the jury believed that the estimate of the distance by the engineer, who thought he blew 100 yards and put on brakes fifty yards from the north end, was correct, then he could have stopped in 150 yards. The force of the engine would have been greatly reduced after the use of all appliances for 100 yards, and it might have been considered by them but a fair inference that the blow would not have been fatal, if harmless at all, when the collision should come, had the engineer used every effort to stop, consistent with safety, immediately on giving the alarm. If he could have stopped the engine in less than 100 yards he might have saved intestate's life, whether he put on brakes at 50 or 100 yards. For

we must bear in mind, also, that it was decided in *Deans* v. *Railroad, supra,* that the jury were not bound to adopt the estimate of the witnesses or to hear expert testimony as to the distance within which an engine might be stopped, but could determine that question as one addressed to their common sense for themselves. By fixing that distance at more or less than 150 yards, the estimate of the conductor being that it would require 400 to 500 yards, and varying the finding as to speed from thirty to fifty miles per hour, according to the conflicting testimony an infinite number of combinations might have been made by the jury as to the different questions of distance and speed and force, giving rise to endless inferences from them.

It was in evidence that the deceased was lame, but was running in the middle of the track on the trestle. It was the province of the jury to say where he was, whether entirely north of the trestle, on the trestle, or at what point on it, when the whistle blew. We are not justified in conjecturing as to their findings of evidential facts, when the witnesses left a margin in distances between 150 and 450 yards, and the jury were at liberty to go even below the minimum mentioned by Lassiter. The jury were justified in concluding that the speed of the engine had not been abated in the least, though a frightened human being had been chased by an engine along a trestle from which the engineer ought to have known he could not escape without peril to life or limb, until he was tossed like a ball into the air and thrown forward for twenty-five yards, where his mangled corpse tumbled off the embankment. The evidence of the fireman that the train was not stopped till it had gone 200 to 250 yards south of the trestle, may have been considered by the jury as corroborative of the other witness who said that the speed was not perceptibly diminished. That would depend upon their estimate of the time and distance requisite for stopping the train, and in settling that question, the jury

very probably first determined what the speed was, whether thirty, thirty-five, forty or fifty miles an hour, according to the varying opinions of witnesses and, possibly, whether it was true that the train was running down-grade, as stated by a witness. They could believe, or discredit, the whole or a part of the testimony of any witness, and we have no right to assume what their finding was. If there was no conceivable view of the testimony in which the defendant's servants might have saved the life that was lost (despite the admitted negligence of the plaintiff, and after it was apparent to the servant sitting upon his engine that the plaintiff had carelessly put his person in jeopardy), by simply using the appliances at his command and without peril to the persons and property in his charge, the Court would have been justified in withdrawing the case from the jury, but not otherwise. The engineer knew, or ought to have known, that the mile-post marked the end of the trestle, and when he saw that the plaintiff's intestate, after turning and looking at the approaching train, was still persisting in his perilous purpose of crossing the trestle in its front, he should have resolved all doubt in favor of human life and forthwith have reversed his engine and put on the brakes. We may assume that he did neither, as there is abundant testimony to have warranted the jury in so believing. At this supreme moment the law and the common instincts of humanity would condemn his rushing recklessly onward for no better reason than that the deceased might jump eleven feet to the ground without injury, or, by a display of unusual agility, might place himself upon a cap.

It is settled law in this State that where an engineer sees that a human being is on the track at a point where he can step off at his pleasure and without delay, he can assume that he is in full possession of his senses and faculties, without information to the contrary, and will step aside before the engine can overtake him. But where it is apparent to

an engineer, who is keeping a proper outlook, that a man is lying prone upon the track, or his team is delayed in moving a wagon over a crossing, it has been declared that the engineer, having reason to believe that life or property will be imperiled by going on without diminishing his speed, is negligent if he fails to use all the means at his command, consistent with the safety of the passengers and property in his charge, to stop his train and avoid coming in contact with the person so exposed. *Deans* v. *Railroad*, 107 N. C., 686; *Bullock* v. *Railroad*, 105 N. C., 180. The same rule prevails where the engineer knows, or ought to know, that a human being has passed a mile-post which marks the end of a trestle nearest to him, and can see that the person despite his signal, persists in running along the track from which he cannot step aside, and from which he can escape instantly only by a perilous jump or unusual activity. The law expects him, when he sees a man still lying motionless, after he has given the alarm signal, to take precaution against the possibility of his being drunk, or where one does not move his team at a crossing under similar circumstances, to act upon the idea that the wagon is fastened in some way. While, as a general rule, the engineer "would have a right to assume that a person walking upon the track was in possession of ordinary sight and hearing, yet where the conduct of the traveller is such as to excite a doubt of this, the engineer is bound to use greater caution," and to stop the train if necessary to secure his safety. 2 Shearman & Redfield on Neg., §§ 483 and 484; Wharton on Neg., § 301; *Railroad* v. *Webber*, 18 Am. Reports, 402.

In *Cook* v. *Railroad*, 87 Ala., 533, it was held error to refuse to charge that if defendant's agents did see, or by the exercise of proper care could have seen, plaintiff's intestate upon said bridge or trestle in time to have stopped said train before it reached him, and that they failed to stop, the defendant was liable. We may add to this rule as appli-

cable to our case that the defendant was also liable if its servant under such circumstances could have so diminished the speed of the engine before the collision occurred as possibly to have saved the life of intestate. The plaintiff was unquestionably negligent, but his negligence was not the proximate cause of his death, if the defendant's servant could have prevented it, after the latter had reason to know of the peril, without danger to persons or property in his charge. 2 Shear. & Red. on Neg., § 484 (p. 298) note 1. The principle laid down in the Alabama case which we have cited, must necessarily prevail in every State where the doctrine of *Gunter* v. *Wicker*, 85 N. C., 312, is established. Where the Courts hold, as in Kansas, that one who walks upon a bridge constituting a part of the track of a railway is a trespasser, and the engineer is not bound to keep a lookout for such an intruder, and if he is killed while on a bridge or trestle the company is only liable for wilful negligence, it follows that they always refuse to sanction the doctrine so fully settled by this Court. Hence, it was found necessary to overrule *Herring* v. *Railroad*, 10 Ired., 402, in *Deans* v. *Railroad*, 107 N. C., 686.

The true test of the engineer's duty is involved in the question whether he has reasonable ground to believe, with all the knowledge of the surroundings which due diligence requires of him, that the life of a fellow-man is in peril, and that the danger to his person can only be averted by stopping or reducing the speed of the train. When an engineer sees a man persistently putting himself in peril on a trestle or bridge, so that he can no more get off the track than one who is lying on it in an apparent stupor, except by exposing himself to danger, why is it not reasonable in him to act instantly on the natural inference that one whose conduct is so extraordinary, is either drunk or bereft of reason from sudden terror? *Cook* v. *Railroad*, *supra;* Wharton on Negligence, § 301.

Greater caution is expected of a company in all cases, where, for any cause, it is apparent that one is not apprised of his danger. 60 Alabama, 621, 640.

Though plaintiff's intestate was negligent in going upon the trestle when he knew, or might have known, before the alarm was given, that a train was approaching, his admitted fault would not excuse the subsequent carelessness of the engineer in inflicting an injury upon him that could have been avoided. One wrong no more justifies another in law than in morals. *Needham* v. *Railroad*, 37 Cal., 407. Because one carelessly exposes his life on account either of drunkenness or deliberate folly, he does not thereby become an outlaw so as to give railroad companies the right to run their through trains in reckless disregard of his safety. There is no presumption that a child or a man apparently drunk will get out of the way. When intestate acted like a drunken man and made no effort to leave the trestle, the engineer should have stopped the train. 2 Woods R. L., 1268 and Note 1. *Kenyon* v. *Railroad*, 5 Hun., *supra; Sheridan* v. *Railroad*, 36 N. Y., 39. Persons in great peril are not expected to exercise the presence of mind and care that would ordinarily be characteristic of a prudent man. The law makes allowance for their excitement, and leaves the circumstances of their conduct to the jury. *Buell* v. *Railroad*, 31 N. Y., 314; *Railroad* v. *Yarnard*, 17 Ill., 509; Wharton on Negligence, § 304.

The jury doubtless thought that the conduct of the deceased, after the engineer saw him on the track, was such that the latter had reason to believe that he was drunk. In corroboration of this theory he had, according to the testimony, two bottles of spirituous liquor upon his person, just as Deans was found with a bottle and a broken glass at his side. According to the views of the testimony which we have presented as the possible and legitimate theories adopted by the jury, there was almost, if not quite, as cogent reason for

the conclusion on the part of the jury in our case as in Deans' case, that a person who acted so unnaturally and carelessly must have been drunk. It was unquestionably negligence to get drunk and lie down upon the track, as it was to go upon it in full view of an approaching train. But in the one case as in the other it was the province of the jury, not of the Court, to determine whether the engineer had reason to believe that a man was so situated that he could not, without peril, get off the track in time to escape the train moving as it was, or was so much intoxicated that he. could not, or would not, attempt to escape, and whether, after he could have discovered the situation, the engineer might, by exercising ordinary care, have avoided the fatal injury. *Cook* v. *Railroad, supra.* Instinct would prompt a man, under such circumstances, to try to save his life, and, in the absence of all evidence, the presumption is that he had exercised due care. *Railroad* v. *Weber*, 76 Penn. St., 157.

In the case of *Deans* v. *Railroad*, it was declared to be the province of the jury to determine which of two natural inferences should be drawn from an admitted state of facts. In our case there are not only different inferences directly deducible from the evidence, but there is contradictory testimony, giving rise necessarily to different. conclusions of law according to the possible findings of the jury. *Railroad* v. *Van Steinburg*, 17 Mich., 99.

We cannot follow counsel in the line of argument adopted, and say, that because the Court held in the case referred to, that without expert testimony the *jury* could exercise their own common sense and determine within what space an engineer might stop his train, we can go a bow-shot further here and declare that the *Court* may judicially determine what would be the relative progress of the two bodies moving upon the same track, the train, whose speed was estimated by various witnesses at thirty to fifty miles per hour, and a man, who was said to be lamed, but whose velocity

was not even guessed at by any witness. The difficulty would be enhanced by the fact, to which we have adverted, that the jury had the exclusive right to say within what distance the train could be stopped, and an essential factor would be wanting if any one outside of the jury should undertake the problem. If, moreover, the case at bar does not present a number both of conflicts in evidence of the various witnesses and of diverse inferences deducible from different views of the evidence leading to conclusions of law, modified according to the inference drawn, it would seem difficult to conceive of one that does.

The Court cannot, for the want of ascertained data, work out the problem so as to reach a special verdict. The engineer, when his train was rushing on at such a speed, and a human being was placing himself in imminent peril of life, was not warranted in making a calculation in his head of this intricate problem. It is now manifest that if he refused to slacken his speed in the least (as we must assume on the demurrer to the evidence he did), and acted upon a hurried calculation as to the rapidity with which the intestate was moving, he made a fatal mistake. The man is dead and the engine killed him. So that the figures, contrary to maxim, were false. If the jury believed that the engineer could, by ordinary care, after seeing the situation of deceased, have diminished the force of the collision so as to bruise instead of killing him, their verdict ought not to be disturbed.

It is due to the counsel who discussed the doctrine of proximate and remote cause with so much subtility, to state briefly the reason why a Court, where the principle announced in *Davies* v. *Mann,* 12 M. & W., and first adopted by this Court in *Gunter* v. *Wicker,* prevails, cannot concur in his line of reasoning. It has been generally conceded, that from the standpoint which is occupied by this Court, the rule of *causa causans* has been more happily and succintly stated by Judge COOLEY in his work on Torts, than by any other

writer.  He says (pp. 70, 71): " If the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which was more remote."  4 Am. & Eng. Enc., p. 25 and note 3, with authorities cited; *Isbel* v. *Railroad*, 27 Conn., 404.  Applying the principle to the facts of our case, it is manifest that, though plaintiff's intestate was negligent in going upon a trestle when he ought to have known that a train was approaching, he would not have been killed if the engineer had stopped the train before it came in contact with him.  If, then, there was any evidence that warranted the finding of the jury in response to the third issue, which meant that the death was due to the negligence of the engineer in failing to stop or diminish the speed of the train, it would follow that the Court must hold, as law, that the negligence of the defendant was the proximate cause of the injury.  The authorities do not sustain the position assumed by counsel.  It makes no difference how short an interval occurs between the negligent act of the plaintiff and that of the defendant, if the latter had time to discover the danger and avert it by the exercise of ordinary care.  4 Am. & Eng. Enc., p. 27; *Needham* v. *Railroad*, *supra*; *Trow* v. *Railroad*, 24 Vt., 494.  The illustration of concurrent negligence given by Judge COOLEY outlines still more clearly the distinction which we have attempted to draw.  It is the case of two persons who, in concert, block up a street.  " Neither of the culpable parties can excuse himself by showing the wrong of the other, for the injury is a natural and proximate result of his own act."  There are two divergent lines of authority upon this subject, but the position assumed by counsel for the defendant finds no support in the decisions of those Courts that have, like this, adhered closely to the doctrine of *Davies* v. *Mann*, 10 M. & W., 545.  The negligence of the plaintiff in our case con-

109 — 29

sisted in going upon the trestle when an approaching train was in sight, as it could have been seen a mile. But if, after he went upon the trestle, the defendant company's servant could, by proper watchfulness, have discovered his danger in time to avert it without jeopardy to the persons or property on defendant's train, and neglected to do so, the negligence of the two was not concurrent nor cotemporaneous. That of the defendant was so far subsequent to the plaintiff's wrongful act as to give time to the servant of the former to have discovered the danger, and averted the injury by the proper use of the means at his command. 2 Thompson Neg., 1157; Wharton Neg., §§ 343, 346, 388.

It was not error in the Court to recapitulate fairly such contentions of counsel as illustrated the bearing of the evidence upon the issues. It is often helpful, if not necessary, for the Court to do so, in order that they may understand how to apply the law to the testimony.

CLARK, J. (dissenting): In this case it is not denied that the plaintiff's intestate was guilty of negligence. The exception taken by the defendant below is, in purport and effect, that there was no evidence sufficient to go to the jury tending to show that, notwithstanding the negligence of the deceased, the injury "might have been avoided by the exercise of reasonable care and prudence on the part of the defendant."

Taking the plaintiff's evidence in every respect to be true, this exception of defendant should be sustained. By that evidence, the plaintiff's intestate was walking on a trestle a little after the regular schedule time of the passenger train, and at a point where he could see the train for a mile. The trestle was 125 feet long, the engineer sounded the whistle 450 or 500 yards from the north end of the trestle going south and about two P. M. in the day-time, the train moving at the rate of thirty to thirty-five miles an hour.

When the engineer sees a man, not known by him to be deaf, drunk or insane, walking on the track, he has ground to believe that on sounding the whistle the man will get off the track in time. He is not compelled to slacken the speed of the train on that account. This has been often decided, and lately in *McAdoo* v. *Railroad*, 105 N. C., 140, and *Meredith* v. *Railroad*, 108 N. C., 616.

It cannot, with reason be contended that in this case this short trestle should have caused the engineer to slacken his speed; for aside from the difficulty of an engineer moving at that speed being able to locate a man on any specified 125 feet of track, there was but 125 feet, *i. e.*, 41⅔ yards of the trestle, and, by plaintiff's evidence, the deceased was five or six yards on the trestle when the whistle blew. If the engineer did not know the man was on the trestle, he had reasonable ground to believe he would not go on it after the signal. If he is held responsible for the knowledge that the man was on the trestle, he had reasonable ground to believe that the man would turn back the six yards he had traversed, and he must also be credited with the knowledge that if the man persisted in attempting to cross that while the engine, moving thirty or thirty-five miles an hour, was running more than a quarter of a mile (456 yards), a man could traverse the remaining thirty-six yards of the trestle, who was walking at one-thirteenth of that speed, or under three miles an hour. It was not unreasonable in the engineer to suppose that a man who would attempt to cross a trestle in front of a passenger train would at least move as rapidly as three miles an hour, when an ordinary walk is more rapid. This is not like Conigland's case, where the deceased was a deaf man and the engineer knew him; nor like Deans' case, 107 N. C., 686, where the man was drunk and helpless on the track; nor like Manly's case 74 N. C., 655, where the injured parties were children ; nor like Troy's case, 99 N. C., 298, where the accident was in the night-time in a populous town and

the train moving at an unusual hour, no headlight used and no signal being given; nor like those cases where the trains were passing out of the regular time and no signal was sounded; nor like live-stock cases, *Carlton* v. *Railroad*, 104 N. C., 365, and the like; nor those in which stress is laid on the fact that stock, unlike human beings, have not intelligence enough to get off the track. Here the train was on nearly regular schedule time, there was no evidence that the man was drunk or that the engineer had reason to think he was; it was in broad daylight (2 P. M.); the signal was sounded in ample time, and the engineer was not wanting in due care in supposing that after the signal the man would not go on the trestle, or if there, he would get off as he had time to do. We do not advert to plaintiff's evidence that the deceased might have escaped by getting on the end of one of the several large sills in the trestle, nor that he could have let himself down to the ground, only some eight feet below. Still less do we advert to the evidence offered for the defendant. But taking the plaintiff's evidence alone, the shortness of the trestle and the signal given in such ample time, it is clear there was no evidence to go to the jury that there was negligence in not stopping or slackening up a train under these circumstances. If the trestle had been a long one, or very high, a different case entirely would be presented. But here it was only a little over forty yards long and eight feet high. With the slightest regard to prudence, the man might and should have gotten off in ample time. If, as is probable from plaintiff's evidence, the plaintiff deliberately walked or recklessly rushed on the trestle after the signal sounded, or walked slower than a man ordinarily does, that was a piece of folly or fool-hardiness that the engineer might well be excused for not anticipating.

Railroads are expected to guard against every avoidable injury, and even to prevent injury to a plaintiff from the consequences of his own negligence, if, by reasonable care

they can avoid it, but the traveling public and the rail-roads have rights also, and the latter should not be held liable for damages in presuming, under the circumstances of this case, that the plaintiff, after the signal given, either would not go on the trestle or, if there, would get off, as he had full time to do.

It is almost certain that the deceased ran upon the trestle after the whistle sounded (for if on it at that time he would have cleared it at an ordinary walk before the engine could have reached it at the speed stated by plaintiff's witness, of thirty or thirty-five miles an hour), and if this is so, it is not shown how close the engine then was to him, and that the engineer could then have stopped his train in time to avoid striking him. Yet, the burden of showing this was on the plaintiff. If deceased was on the trestle when the whistle blew, the engineer knew he had ample time to cross so short a trestle before the engine could reach it. If he went on it after the whistle blew, it is not shown when, nor that the engineer could then have stopped the train in time.

In *Deans* v. *Railroad, supra*, it is said: "We have reiterated the principle that where an engineer sees a human being walking along or across the track in front of his engine, he has a right to assume, without further information, that he is a reasonable person, and will step out of the way of harm before the engine reaches him. *McAdoo* v. *Railroad*, 105 N. C., 153; *Daily* v. *Railroad*, 106 N. C., 301; *Parker* v. *Railroad*, 86 N. C., 221." The same rule is again laid down in *Meredith* v. *Railroad*, 108 N. C., 616. These cases should be decisive of the one before us. Here, from the shortness of the trestle, the distance at which the train could be seen, and the length of time the signal was given, "the engineer had the right to assume that the person would step out of harm's way before the engineer reached him." To lay down the principle that where an engineer sees a man apparently sober on a short and low trestle, the full length of which he

knows the man, at an ordinary gait, can cross after the signal is sounded, he must, nevertheless, stop or slacken speed; or that if he sees a man walking near such trestle he must do likewise for fear that he may rush upon the trestle and try to beat the train across, is a rule that is hardly consistent with the decisions above cited, nor consonant with the right-of-way of the railroad to the use of its own track. Should the man, nevertheless, be so fool-hardy, as was probably the case here, as to run upon the trestle after the signal was given, the engineer, in the interest of human life, should stop the train if time is given him to do so, but the burden of showing that he could do so is on the plaintiff. Upon the plaintiff's evidence in this case, his intestate was guilty of gross negligence, and there was no evidence sufficient to go to the jury that the defendant, by the exercise of reasonable care and prudence, could have avoided the unfortunate consequences of the intestate's recklessness. The engineer knew that the intestate, if on the trestle, had ample time to get off after the whistle sounded, and reason to suppose that he would do so, and he was not called on to anticipate that the intestate would rush upon the trestle when the engine was so close at hand that it does not appear it could have been stopped in time to avoid the accident.

DAVIS, J., concurred in the dissenting opinion.

*Per curiam.*                                                      Affirmed.