## M. B. SMITH v. NORFOLK AND SOUTHERN RAILROAD COMPANY.

(Filed 25 September, 1907).

**1. Maritime Law—State Courts—Negligence—Practice.**

In an action for damages in the State courts for injuries received by one vessel in collision with another, alleged to have been caused by the negligence of the other, the rules obtaining in courts of admiralty in such cases do not apply.

**2. Same—Negligence—Evidence—Only Cause—Nonsuit.**

When it appears that the vessel of plaintiff company altered its course in a fog in a manner not to have been anticipated or foreseen by the officers in charge of defendant's vessel, so as to unexpectedly bring the vessel of the former across the bow of the latter, each hearing the fog signal of the other, and the officers on the defendant's vessel reasonably believing therefrom that plaintiff's vessel would pass in ample water for the purpose, and, upon the first opportunity to see the danger, did all that was possible to avoid it, the unexpected change of course by plaintiff's vessel is the proximate cause of the injury, and a motion as of nonsuit, upon the evidence, should have been allowed.

**3. Same—Negligence—Only Cause—Contributory Negligence—Last Clear Chance.**

When defendant's vessel, in a fog, was exceeding the speed prescribed for such conditions, but the unexpected and unforeseen change of course of plaintiff's vessel was the direct cause of the injury, the issue upon "the last clear chance" does not arise, there being no element of negligence or "continuing negligence on the part of the plaintiff."

CIVIL ACTION, tried before *Neal, J.,* and a jury, at February Term, 1907, of the Superior Court of CRAVEN County, for injury caused by alleged negligence of the defendant in a collision between two boats on Neuse River.

Eliminating nautical terms and irrelevant matter, the plaintiff's evidence makes the following case: The steamer "Neuse," belonging to and controlled by the defendant company, on the morning of 25 August, 1905, while making her regular run up the Neuse River to New Bern, encountered a fog near Otter Creek buoy. Her course was north-north-

west; she was in shoal water. Her regular speed was from twelve to thirteen miles an hour. Shoal-water speed, at which she was running at the time she entered the fog, was eight miles an hour. She was properly equipped and in charge of a competent officer, who had been her first officer fourteen years. When the steamer entered the fog he was and at all times remained in his proper position, in charge of the watch in the pilot house, at the window on the port side of the wheel, blowing fog signals; began blowing before he entered the fog.

The steamer "Blanche," belonging to plaintiff, on the same morning, at about 6:10 o'clock, left New Bern, going down the Neuse River to points on Bay River. Her course was south-southeast ½. She was properly equipped and in charge of a competent officer. She encountered the fog and began to blow her fog signal. Her regular speed was seven miles an hour, which she maintained after entering the fog until she reached Johnson's Point, when she took a southeast course. The officers in charge of the two steamers each heard the fog signals of the other. The officer of the "Blanche" says that his usual course is to pass Johnson's Point and keep on down to Hampton Shoal buoy, the course being south-southeast ½. On the day of the collision, before passing Johnson's Point, he "starboarded and went to the port"; thought it would put her out of the way of the "Neuse" and get off shoal water. The change had the effect to put the "Blanche" across the course of the "Neuse." The plaintiff introduced the officer of the "Neuse," who testified that he heard the fog signals of the "Blanche" on his port bow; that he was going north-northwest; that the signals of the "Blanche" were always on the port bow. "The first glimpse of her I could not understand; her position ranged across our bow, and I blew four short whistles and struck four bells to back, blowing the whistles with the right and striking the bells with the left hand." Q. "Up to the time she appeared

her whistles always sounded on your port bow?" Ans. "Yes, sir." Q. "If she had been proceeding on a proper course down the channel, what would that course have been?" Ans. "Going down the main channel about south-southeast." There was plenty of water and plenty of room "for the 'Blanche' to have proceeded, port to port." Q. "If the 'Blanche' had fulfilled her duty, will you state whether or not there would have been a collision?" Ans. "I don't think there would. There was room for her to have passed on her starboard side. The boat which has the other on her own starboard hand shall keep out of the way, and it was the duty of the other vessel to navigate with caution, if necessary, if she thought there was danger of collision." Q. "State whether, up to the time you saw the 'Blanche' appearing out of the fog and crossing your bow, there was anything in the situation which showed that she was going to attempt to cross your bow?" Ans. "No; the whistle sounded on the port bow all the time." Q. "Up to the time the 'Blanche' appeared in the fog, will you state whether or not there was anything, from the sound of the whistle or the location, which would indicate that there would be any danger in passing if each vessel was properly navigated?" Ans. "No, sir." Q. "When was it you first ascertained that there was danger of collision?" Ans. "When I sighted her." Q. "Was there anything at that time which you could have done to avoid the collision?" Ans. "Nothing, in my judgment, more than I did."

After testifying that he was running at eight miles an hour, being shoal-water speed, he was asked, "Had you reduced the speed at all on account of fog?" Ans. "No, sir; we never reduce speed. It is done from the engine room." He says that he could not rightly tell how fast he was moving when he struck the "Blanche"; that he should judge about three or three and a half miles; reduced speed by backing. Q. "Suppose you had been going up at three miles an hour and had backed, your boat would have been stopped without sinking

the 'Blanche,' wouldn't it?"    Ans. "It is a mathematical calculation."

It was in evidence that when the officer of the "Neuse" first saw the "Blanche" she was about fifty yards distant from him—about the length of his boat.   The defendant introduced no evidence, but moved for judgment of nonsuit.   Motion denied, and defendant excepted.

The following issues were submitted to the jury:

1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint?

2. If so, did plaintiff, by his own negligence, contribute to the injury?

3. Notwithstanding the plaintiff's contributory negligence, could the defendant, by the exercise of the rule of the prudent person, have avoided the injury?

The defendant excepted to the third issue.

The jury, under the instructions of the Court, answered the first issue "Yes."   By consent, the second issue was answered "Yes."   The jury answered the third issue "Yes."   There was judgment upon the verdict for $2,000.   Defendant excepted and appealed.

*W. W. Clark* for plaintiff.
*Simmons, Ward & Allen* and *H. H. Little* for defendant.

CONNOR, J., after stating the case: As, in our opinion, the defendant was entitled to judgment of nonsuit upon the motion made at the close of the testimony, it is unnecessary to discuss or pass upon the exceptions to the instructions given, and the refusal to give others requested by defendant.   The action being prosecuted in the State courts for alleged negligence, the rules obtaining in courts of admiralty in such cases do not apply.   The rights and liabilities of the parties are to be ascertained by resorting to the principles which control in actions for alleged negligence wherein contributory negligence is set up as a defense.   *Fuller, C. J.,* in *Belden v. Chase,* 150

U. S., 674, says: "At common law the general rule is, that if both vessels are culpable in respect of faults operating directly and immediately to produce the collision, neither can recover damages so caused. In order to maintain his action, the plaintiff was obliged to establish the negligence of the defendant, and that such negligence was the sole cause of the injury; or, in other words, he could not recover, though defendant was negligent, if it appeared that his own negligence directly contributed to the result complained of." 25 Am. and Eng. Enc., 1025. The motion for judgment of nonsuit involved two propositions: First. That there was no evidence of negligence on the part of the "Neuse." Second. That if there was negligence the admitted contributory negligence on the part of the "Blanche" intervened and became the proximate cause of the injury, thus preventing a recovery. This is undoubtedly true, unless the plaintiff can maintain a third proposition: That defendant, having knowledge of plaintiff's negligence, failed to use ordinary care to prevent the injury. Barrows on Neg., 35. "It is sometimes said to be the rule that a plaintiff may recover, notwithstanding the fact that his own negligence exposed him to the risk of injury, if the defendant, after becoming aware of plaintiff's danger, failed to use ordinary care to avoid injuring him." Beach Cont. Neg., sec. 54. It being established that defendant was negligent— that is, guilty of a breach of duty—and that plaintiff was also negligent, the law fixed the liability upon the one whose negligence was the proximate cause of the injury. If fixed upon the defendant, it is because of his negligence and the absence of any intervening negligence on the part of plaintiff contributing to the injury. Where the injury is the result of a sequence of negligent acts or omissions, the rule is thus stated by *Judge Cooley:* "If the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission of another, the injury shall be imputed to the last wrong as the proximate cause, and not to that

which was remote." Cooley on Torts, 70, cited with approval in *Clark v. Railroad,* 109 N. C., 430; *Pickett's case,* 117 N. C., 616.

In *Farmer v. Railroad,* 88 N. C., 564, it is said: "Where an injury results from negligence, and the act of the plaintiff is directly connected and concurrent with that of the defendant, the plaintiff's negligence is the proximate cause of the injury, and will bar his recovery in an action for damages; but, where the negligent act of the plaintiff precedes that of the defendant, it is the remote cause, and the defendant will be liable if the injury could have been avoided by the exercise of reasonable care." These and other decisions holding this doctrine are based upon the case of *Davies v. Mann,* 10 M. & W. (Exch.), 546. In all of the cases the liability is put upon the party whose negligence is the proximate cause of the injury. Upon the undisputed evidence in this case, we think it very doubtful whether there is any evidence of negligence on the part of the officer of the "Neuse"; but, passing that question, it is clear that the admitted negligence of the "Blanche" was last in order of sequence, and, as the learned counsel properly conceded, *contributed* to the injury. The answer to the second issue put an end to the controversy. The officer of the "Neuse," introduced by plaintiff, says that before entering into the fog he blew fog signals and continued to do so until he saw the "Blanche"; that he was on the watch in the pilot house; that his course was north-northwest; that he heard the fog signals of the "Blanche"; that they were always on the port bow, clearly showing her position; that nothing occurred to indicate that she would change her course or her position, her course being south-southeast ½; that she had plenty of room to pass, and that the first intimation he had of danger was when, fifty yards distant, he saw her across his course; that he immediately blew the proper signals, rang the bells, reversed his engine, backed his boat; that he did

everything in his power to avoid the collision. Conceding that at the moment he saw the "Blanche" he was going faster than the rules allowed, is it not apparent that, but for the erratic course of the "Blanche," he could and would have proceeded with perfect safety to both boats. The case comes clearly within the principle of *Pickett's case* and numerous other authorities. But the learned counsel for plaintiff calls attention to the rules established by Congress to prevent collisions: "Every vessel shall, in a fog, go at a moderate speed, having careful regard to the existing circumstances and conditions." He insists that the term "moderate speed" has been defined to be such a speed as will enable the boat to stop within a distance at which he could see another boat. In the *Umbria,* 166 U. S., 404, *Judge Brown,* after a very exhaustive discussion of the authorities on the subject, says: "The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precaution as will enable her to stop in time to avoid a collision after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law." In other words, the steamer should so reduce her speed when in a fog that steamers which are free from blame or negligence may not be injured. The learned Justice proceeds to say that, in a dense fog, this rule might require both vessels to come to a standstill. In a lighter fog it might authorize them to keep their engines in sufficient motion to preserve their steerage way; the true principle being that they must use due diligence, the standard of which, in the light of the rules, being measured by "existing circumstances and conditions." The distinction between the measure of duty to avoid injury imposed upon a locomotive engineer passing a public crossing and running on the track where there is no such crossing, is pointed out by *Smith, C. J.,* in *Parker v. Railroad,* 86 N. C., 221. In the former the public have an equal right with the train; the engineer must anticipate that persons will be using

the crossing, and lower his speed so that he may have his engine under such control that he can stop before coming in contact with a person on the crossing. Persons using the crossing must, however, use ordinary care to avoid injury. This speed, in towns, is usually fixed by ordinance, and in many cases its violation is declared to be, as matter of law, the proximate cause of the injury. It is unnecessary to discuss the distinction made in that class of cases and the one before us. There was nothing in the conditions by which the "Blanche" was surrounded to cause her to change her course. The undisputed evidence is that "she had plenty of room and water" to pass the "Neuse" in safety. Her officer elected to change the course, the effect of which change was to throw her across the course of the "Neuse" at a point which rendered it impossible to prevent collision. The "Neuse," with a regular speed of twelve miles, was running at the shoal-water speed of eight miles. There is nothing in the evidence showing that her surroundings required any further reduction to prevent injury to a steamer herself free from negligence, or to indicate that the only steamer of whose presence in the river she had any notice was off her course until too late to prevent the injury. Whatever may have been said by this Court in regard to "continuing negligence," the facts in this record do not come within the doctrine of any case wherein that expression is used. Measured by the well settled principles of the common law, we find no evidence upon which to base the third issue. We are of the opinion that, by a shorter route, the same result would have been reached by granting the motion for judgment of nonsuit. In refusing the motion there was error. Let this be certified to the Superior Court of Craven, to the end that judgment be entered dismissing the action.

Error.