## THE WILLIAMSPORT.

### CUNNINGHAM v. PAXSON et al.

(Circuit Court of Appeals, First Circuit. May 28, 1896.)

#### No. 147.

1. COLLISION—SUPERVISING INSPECTORS' RULES—WHERE APPLICABLE.

Vessels navigating in the lower harbor of Boston, inside of the line drawn from Lovell's Island to Deer Island, are subject to the regulations of Rev. St. § 4233, and the rules of the supervising inspectors. The Ludvig Holberg, 15 Sup. Ct. 477, 157 U. S. 67, and The Delaware, 16 Sup. Ct. 516, 161 U. S. 459, applied.

2. SAME—TUG AND TOW WITH STEAMER—INSUFFICIENT LOOKOUT.

A tug, with a tow lashed to her side, *held* solely in fault, on her own theory of the collision, for having no other lookout than the captain of the tug, who was at the same time also engaged in other duties, so that the approaching steamer was not seen until too late to avoid collision.

Appeal from the District Court of the United States for the District of Massachusetts.

This was a libel by Milford T. Cunningham, managing part owner of the tug Bessie B., against the steamship Williamsport, to recover damages resulting from a collision. The district court dismissed the libel, and the libelant appealed.

Charles T. Russell, for appellant.

Robert M. Morse and William H. Richardson, for appellees.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. We are of the opinion that we should affirm the decree of the district court in this case. The collision was between the steamer Williamsport, bound in, and the tug Bessie B., lashed to the starboard side of her tow, the schooner Carrie E. Phillips, bound out, and it occurred in the lower harbor of Boston, inside of the line drawn from Lovell's Island to Deer Island, and therefore was undoubtedly subject to the regulations found in section 4233, Rev. St., and in the rules of the Supervising Inspectors. The Ludvig Holberg, 157 U. S. 60, 70, 15 Sup. Ct. 477; The Delaware, 161 U. S. 459, 463, 16 Sup. Ct. 516. It took place October 13, 1893, about half past 7 o'clock in the evening, near the point of junction between the sailing course up the Narrows and the main course through President's Roads. The sun set at 23 minutes past 5 o'clock.

It is said, on behalf of the tug Bessie B., that the weather was clear and moderate. The Williamsport says that the night was very dark and a "little mite misty," but that there was no trouble in seeing vessels' lights. The tug claims that she intended to go through the Sound; and, as the wind was from the southerly, if the tug and the schooner in tow were on the main course through President's Roads, or had gone to port in order to take a course through the Sound, the wind would have carried the schooner's sails, which were set, to her port, and have uncovered to the Williamsport the lights of the Bessie B. If, however, the schooner had swung towards a course through the Narrows, the sails and hull of the schooner might have concealed the lights of the tug. The Williamsport was heavily

laden with coal, and was a slow vessel, some eight or nine knots. The tug claims that she (the tug) was proceeding at a speed of about four and one-half knots; but the tide was with her, and the time given by her master, Capt. Marcial, shows that she made the distance of about eight miles from T Wharf to Nixey's Mate in an hour and ten minutes, so she was probably running over the ground at least as fast as the Williamsport.

According to the story of the tug, she first sighted all the lights of the Williamsport coming up the Narrows, two points, or two and one-half, on the tug's starboard bow. On this theory, she was bound to give the Williamsport her course, and keep out of her way, and the burden would have been on the Bessie B. to show that she did this. On the other hand, the Williamsport maintains that she first saw only one red and one green light, presumably the lights of the schooner, about two points on the Williamsport's port bow, and her master so testifies. She claims that the hull and sails of the schooner concealed the lights of the tug, so that she supposed she was meeting only a sailing vessel, and therefore slowed down until she believed herself clear of her. The proofs in behalf of the Williamsport sustain this proposition, and are fair on their face. If the position of the tug and tow, when first sighted, was as claimed by the Williamsport, they were off their course through Broad Sound; and the case is directly at issue on this point. On the theory of the tug, she must have been on the point of crossing the course of the Williamsport when she first sighted her; so that, if she sighted her seasonably, the tug, with the speed at which she was evidently running, ought to have been well clear of the Williamsport before she came up. On the theory of the Williamsport, the Williamsport must, in like manner, have been crossing the course of the tug and tow, to their port, and would quickly have gone clear of them. Her proofs support this, because they are to the effect that, soon after sighting the green and red lights, she saw only a red light, indicating that she had thus crossed to their port.

The tug claims that, on sighting the Williamsport, she gave the inspectors' signals of two whistles, intending to pass out through the Sound, and the Williamsport responded with two whistles, and that then the tug put her wheel to starboard, and thereupon swung to port about three points. She charges the Williamsport with failing to starboard promptly after giving two whistles, with going at a high rate of speed, and with neglecting to stop and reverse. The Williamsport admits that the tug gave two whistles, and that she responded to them; but she claims that they were given immediately before the collision, so that, in effect, the tug cut across the bow of the Williamsport too late for the latter to avoid a collision, and that she responded with two signals, and put her port hard to starboard, as the only thing of use in the emergency. The testimony of Capt. Caton, of the schooner, who was then at her wheel, seems to sustain the position of the Williamsport, and indicates that, when the tug's whistles were sounded, it was impossible to avoid the collision. At least, it appears, by his evidence, that he immediately ran forward to save his life. Reading the whole of his testimony on this point shows that he was compelled to act very hurriedly, and,

in fact, it probably took longer to state the facts than to act them.

The real question in this case turns upon the courses of the vessels when they were first sighted. Was the tug holding her course for the Sound, as she claims? If yes, the Williamsport should have seen the lights of both the schooner and the tug, all of which, it is admitted, were burning. If, on the other hand, she was off her course, which is the only theory which can excuse the Williamsport, the case directly contravenes the testimony of her witnesses. This question is presumably one of lookouts. The tug claims that she had two men on the lookout, but the testimony of Capt. Caton, of the schooner, is that he was at the wheel, and did not know where his men were. The claim is, in effect, contradicted by Capt. Marcial of the tug, who was forward at the bow of the schooner, and states that he was the only man on the lookout. He was giving orders to the man at the wheel of the tug, and was variously engaged, as stated in the opinion of the district court. On the other hand, the evidence touching the diligence and watchfulness aboard the Williamsport is quite consistent and satisfactory, though, applying The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, neither vessel had the lookouts required under the circumstances. If this case were closer than it is, and the Bessie B. was not, in effect, condemned by her own proofs, the deficiency on the part of the Williamsport in this respect would put her in jeopardy.

It is further stated, anew, in The Oregon, that a fault of this character is not of importance, unless shown or presumed to have contributed to the collision; and the Bessie B.'s own proofs seem to convict her. On her own showing, the Williamsport, when first sighted, was two points to two points and a half on her starboard bow, and showed both lights, as we have already stated. It is evident that, on this theory, the tug would speedily have gone clear. Her proofs also show that, after the exchange of whistles, the Williamsport, from showing both green and red lights, showed until the collision only her green light. It will also be remembered that the tug had starboarded, as she says, and swung to port three points before the collision. Now, starting on the theory of the tug, with the tug on the point of clearing the course of the Williamsport by running to the Williamsport's starboard, and both vessels then swinging to port, it seems impossible for this collision to have occurred, unless on the hypothesis that, when the schooner first sighted the Williamsport, the vessels were in close contact. This hypothesis, however, would, if accepted, so far impugn the lookout of the tug and schooner as to destroy their case. The probability is that the efficient cause which led up to the circumstances of the collision was the omission on the part of the tug and tow to maintain, as required by maritime usages, and uniform judicial decisions, at a proper station, even one suitable person charged with the sole duty of lookout. However this may be, we are unable to sustain, in any aspect of the proofs on behalf of the Bessie B., her theory of the maneuvers of the vessels concerned, and we are of the opinion that she has failed to maintain the burden of holding the Williamsport in fault.

The decree of the district court is affirmed, with costs.