[S. F. No. 15366.   In Bank.—July 29, 1935.]

AXEL PAULSEN, Respondent, v. WILLIAM C. McDUF-
FIE, Receiver, etc., Appellant.

112

J. Hampton Hoge and A. Dal. Thomson for Appellant.

Ford & Johnson and George K. Ford for Respondent.

CURTIS, J.—An action to recover damages for personal injuries.

Plaintiff was a seaman employed by defendant in operating the ship "Kekoskee", which was moored at a wharf in San Francisco. At the time of his injury he was acting as boatswain and assisting in heaving in or bringing on board from the dock one of the ship's mooring lines. This line was a manila rope from six to eight inches in circumference. The work was being done by means of a steam winch, which consisted of a revolving drum, which was referred to by the different witnesses as the "gypsy head", "nigger head", or "spool". While engaged in this work plaintiff's blouse, a loosely fitting shirt, caught either between the strands of the line or between the line and the drum, and he was injured. He claims that this was due to defendant's negligent method of rigging the line, the defect in the line itself, namely, that its strands were frayed and loose, and this with the manner in which it was rigged caused it to slip or, as he described it, surge on the revolving drum. He was attempting to correct the latter difficulty when the accident occurred. He also claims defendant was negligent in not having the required number of men on the line.

A jury returned a verdict in his favor.

The defendant, who has appealed from the judgment entered thereon, contends that no negligence on his part was shown; that plaintiff assumed the risk of injury, and further,

that the trial court erred in certain of its instructions to the jury.

We will first consider the question of the defendant's negligence. Plaintiff claims that defendant was negligent in the rigging of the line, in the use of a worn and frayed line, and in having only three men assigned to the heaving in of said line when he should have had four. There is evidence to support each of these contentions. Paulsen, the plaintiff, sustained his injury on January 24, 1931, as the ship "Keko-skee" was leaving the pier at the foot of Sixteenth Street, San Francisco. At about 10 o'clock of the evening of that day certain of the seamen on board the ship were called out to haul in the mooring line. The chief officer, G. F. Lind-holm, the plaintiff, and a seaman by the name of N. K. Neilsen responded to the call. Neilsen, at the direction of the chief officer, put the line around the "bitt" and then took his place in front of the winch. Plaintiff took a position just behind the winch and only a few feet to the left of the throttle. The chief officer turned on steam by operating the throttle and then went to the side of the boat where he could see the line as it had been released from the dock. He then gave orders to heave in the line. The winch was revolving, but at such slow speed that it failed to draw in the line. Paul-sen stepped to the throttle and turned on more steam. This caused the winch to revolve more rapidly. The increased speed of the winch drew in the line, but while being thus drawn in the line slipped or surged. The plaintiff, after turning on the additional steam, resumed his position back of the winch and attempted to remedy the surging or slipping of the line and in so doing was injured. He received no orders from Lindholm to increase the speed of the winch, but testified that as boatswain it was his duty to attend to the throttle, and that when the winch failed to draw in the line, the proper thing to do was to turn on more steam. The evi-dence further shows that the line as it was brought onto the ship through an opening in the side of the ship called a chock, was taken around a bitt, an upright stationary metal cylinder, and then onto the winch, instead of around the fairlead. The fairlead was equipped with a revolving cylinder and it was in direct line with the winch, so that the mooring line, when carried from the fairlead to the winch, formed a right angle with the face of the winch. As thus rigged, it re-

quired less power when hauling in the line to operate the winch than if it were around the stationary or nonrevolving bitt. Furthermore, as the bitt was not in a direct line with the winch, the line, when brought around the bitt and then to the winch, formed an oblique angle with the winch. As thus rigged it not only required more power to operate the winch but the line when it reached the winch would be much more liable to surge and slip than it would have done if carried around the fairlead. There is ample evidence to show that the line was rigged around the bitt and that that method was not proper. The evidence also shows that in heaving in the line it is customary to have four men—the first officer, two seamen and the boatswain. Even a witness for defendant, the captain of the ship, testified to that fact. Another witness testified to the same effect, and it would appear that when there were four men on the job the first officer stood by the rail and directed the men in their work, the boatswain attended the throttle controlling the steam, one seaman stood in front of the winch pulling in the line as it came over the winch and the other stood back of the winch directing the line as it reached the winch. According to this evidence it was plaintiff's duty, he being the boatswain, to attend the throttle, but on account of there being only three men engaged in hauling in the line on the night of his injury, it seems he was required to divide his time between the throttle and the line as it reached the winch. It was while he was attempting to perform this double duty that he sustained his injury. There is a sharp conflict in the evidence as to the condition of the mooring line in use on the ship at the time of plaintiff's injury. The captain of the ship and others testified that the line was in fair condition and that it had been in use for some months prior to the accident and that after the accident it was used without further trouble. On the other hand, plaintiff and his witnesses testified that the line was old, worn and chafed, that many of its strands were broken and that the loose pieces hung down, "some one inch, some three, some four inches, depending on the place they go". One witness went so far as to state that he spoke to the first officer several times before the accident regarding the condition of the line and told him that the line was just a piece of junk and ought to be changed. There is evidence that a line or rope in the condition described by plaintiff and

his witnesses is much more apt to slip or surge than a rope in good condition, and also that seamen working near a winch with a defective line with broken strands hanging down three and four inches in length are much more liable to have their clothes caught and drawn in between the line and the winch in the manner in which the evidence shows the plaintiff's blouse or shirt was caught at the time of his injury. From this review of the evidence, it is apparent that there is no merit in defendant's contention that no negligence on defendant's part was shown. On the other hand, we find the evidence is ample in every respect to support the implied finding of the jury that the defendant was negligent in each of the three particulars specified above.

■ Having determined that the evidence established the negligence of the defendant, the question arises as to whether the plaintiff assumed the risk out of which his injury arose.

This action was brought and is being prosecuted in pursuance of an act of Congress, commonly known as the Jones Act (46 U. S. C. A., sec. 688), which in part provides as follows:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; . . . "

By the terms of said act a seaman is entitled to all the right and remedies granted to railway employees under the Federal Employers' Liability Act. (45 U. S. C. A.) Section 51 of said act, so far as it is material to our purpose, provides as follows: "Every common carrier by railroad while engaged in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for injury . . . resulting in whole or in part from the negligence of any of the officers, agents, employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars . . . or equipment."

By section 52 of said act, it is expressly provided that contributory negligence on the part of the injured employee "shall not bar a recovery, but the damages shall be diminished

by the jury in proportion to the amount of negligence attributable to such employee".

By section 54 of said act, in an action to recover damages sustained by an injured employee, "such employee is not to be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury . . . of such employee". It is contended by defendant that by virtue of this section of the act, the common-law rule of assumption of risk applies to all cases brought in pursuance of said act, except as modified by section 54. This section, however, must be read in connection with section 51 of the act, which expressly makes the employer liable for any injury sustained by the employee from the negligence of the employer, its officers or agents. When the two sections of the act are so read it is clear that the intent of the act was to provide that the employee does not assume the risk of danger attributable to the employer's negligence or to the negligence of the employer's agents or employees.

It was so held in the case of *Anderson* v. *Matson Nav. Co.*, 125 Cal. App. 447, 454 [13 Pac. (2d) 1041], where the court, quoting from 56 Corpus Juris, 1100, enunciated the rule as follows: "The doctrine of assumption of risk is inapplicable where the damage was proximately caused by the negligence of a fellow servant. The seaman does not assume the risk of injury from the negligence of an officer, or from other member of the crew."

In support of the doctrine there announced the court cites the case of *Reed* v. *Director General of Railroads*, 258 U. S. 92, 95 [42 Sup. Ct. 191, 66 L. Ed. 480], where that court states the law as follows:

"In actions under the federal act the doctrine of assumption of risk certainly has no application when the negligence of a fellow servant which the injured party could not have foreseen or expected is the sole, direct, and immediate cause of the injury. To hold otherwise would conflict with the declaration of Congress that every common carrier by railroad while engaging in interstate commerce shall be liable to the personal representative of any employee killed while employed therein when death results from the negligence of any of the officers, agents or employees of such carriers."

■ While this rule would not apply in a case where the want of care or negligence on the part of any employer, or his servants or agents, and the danger arising therefrom, are so obvious that an ordinarily careful person under the circumstances would observe and appreciate them (*Gila Valley Ry. Co.* v. *Hall*, 232 U. S. 94 [34 Sup. Ct. 229, 58 L. Ed. 521]; *Seaboard Air Line Ry.* v. *Horton*, 233 U. S. 492 [34 Sup. Ct. 635, 58 L. Ed. 1062, Ann. Cas. 1915B, 475, L. R. A. 1915C, 1]), yet when the employee is injured while acting under orders of his employer, or some authorized agent acting for the employer, he does not assume the risk out of which the injury arose. (*McGeorge* v. *Charles Nelson Co.*, 107 Cal. App. 148, 151 [290 Pac. 75].) This rule is applied more liberally in favor of seamen than employees upon land. (*Lejeune* v. *General Petroleum Corp.*, 128 Cal. App. 404, 414 [18 Pac. (2d) 429], *Anderson* v. *Matson Nav. Co., supra,* and *McGeorge* v. *Charles Nelson Co., supra.*) In the Lejeune case the court said: " 'A seaman in the performance of tasks connected with his employment does not assume the risk of negligent acts of those in charge of his ship or their failure to take reasonable precautions. (*States S. S. Co.* v. *Berglann,* 41 Fed. (2d) 456.) The relationship of master and seaman is intimate and peculiar. (*Masjulis* v. *United States etc. Corp.*, 31 Fed. (2d) 284, 285.) He is bound to obey, and there is no assumption of risk, even though the danger may have been obvious to him. (*United States* v. *Boykin,* 49 Fed. (2d) 762; *Panama R. Co.* v. *Johnson,* 289 Fed. 964; *Wychgel* v. *States S. S. Co.*, 135 Or. 475 [296 Pac. 863].)' "

The reason of this rule is stated in apt language in the McGeorge case as follows: "It cannot be that Congress intended to make applicable to seamen the entire doctrine of assumption of risk, as the same has been developed under the law of railway carriage. This necessarily results from the difference in the terms of the two employments. The servant or employee on shore is free to quit at will his employment, if there appear to him dangers in it. This the seaman cannot do."

■ Applying these rules to the facts in this case, we do not think that it can be held that the plaintiff assumed the risk out of which his injury arose. As we view the evidence

as a whole, the proximate cause of the plaintiff's injury was the negligence of the defendant's employees in placing the mooring line around the bitt instead of the fairlead, aided, no doubt, by the worn condition of the mooring line, and the failure to have four men assigned to the heaving in of the line. Placing the line around the bitt caused it to slip or surge on the winch, and also necessitated more power in order to draw in the line. Plaintiff had nothing to do with rigging the line around the bitt and the evidence shows that he did not know it was not placed around the fairlead. He had the right to assume that the line was properly placed. (*Chesapeake & Ohio Ry. Co.* v. *De Atley,* 241 U. S. 310 [36 Sup. Ct. 564, 60 L. Ed. 1016].) With Neilsen he was ordered to heave in the line. He was endeavoring to carry out this order when he was injured. The evidence shows conclusively, we think, that had the line been properly placed around the fairlead it would not have slipped or surged on the winch, and there would not have been any trouble in bringing it in. It was the negligence of defendant's agents or employees that produced the condition on the winch and it was while plaintiff was endeavoring to right or overcome this condition that he sustained his injuries. Plaintiff might have exercised greater care in working near the winch, and thus have avoided injury. Even assuming that he did not act with due care in his endeavor to overcome the slipping of the line, yet as we have seen under the federal statutes, contributory negligence is not a defense in an action such as the present one. He was therefore entitled to recover for the injuries sustained.

Defendant complains of a number of instructions given by the trial court at the request of the plaintiff. Two of these criticised instructions relate to the rule of assumption of risk, and we think the objections made to them have been adequately answered by what we have said upon that subject. A further instruction, or a combination of instructions, related to the duty of the defendant to furnish a reasonably safe place for plaintiff to work. The principal criticism of defendant to this line of instructions seems to be directed to the frequent repetition of the term "unsafe place", or its equivalent in meaning, in said instruction to such an extent that the jurors were unduly impressed with

the importance of that phase of the case. We are not able to perceive how the defendant was materially injured by any of these instructions, or by all of them, taken as a whole. Finally, defendant complains of the giving of the following instructions:

"Under the law it is presumed, until the contrary appears from the evidence, that the plaintiff at the time and place in question was exercising ordinary care and acting as a reasonable, prudent person would act. This presumption is in itself evidence in this case, to which the plaintiff is entitled unless it is rebutted by other evidence." Plaintiff justified the giving of this instruction, and relies on the case of *Smellie* v. *Southern Pacific Co.*, 212 Cal. 540 [299 Pac. 529]. In that case, however, the party whose conduct was in question was dead. In the absence of his testimony as to how he met his death the court indulged in the presumption that the deceased took ordinary care of his own concerns. (Sec. 1963, subd. 4, Code Civ. Proc.) In the present action, plaintiff was not only alive but was called as a witness and testified fully as to all of his actions just prior to and at the time of his injury. Other witnesses observed plaintiff and gave in detail a complete account of the whole affair which resulted in plaintiff's injury. It is difficult to see how there was any place for a presumption as to the plaintiff's conduct. What he did on that occasion was entirely covered by the evidence in the case, and there was neither necessity nor reason for indulging in any presumption upon that subject. That instruction had no place in this case and should not have been given. Had this been a case where the contributory negligence of the plaintiff would have defeated his claim for damages, the consequences following the giving of that instruction might have been most serious, and possibly might have required a reversal of the judgment. In the present action, however, we have, as shown in the discussion herein, been much more concerned with the action of defendant's employees, and with the question of their negligence, than we have in the conduct of the plaintiff. Admitting that the plaintiff was negligent, still he is, as stated above, entitled to recover in this action. We are therefore of the opinion that the giving of this instruction worked no serious prejudice to the defendant. On the whole, the instructions were

full and fair and were just, both to the plaintiff and the defendant.

The judgment is affirmed.

Seawell, J., Waste, C. J., Shenk, J., Langdon, J., Preston, J., and Thompson, J., concurred.

Rehearing denied.