[S. F. No. 17102. In Bank. May 25, 1945.]

JOE INTAGLIATA, Respondent, v. SHIPOWNERS & MER-
CHANTS TOWBOAT COMPANY, LTD. (a Corpora-
tion), Appellant.

Derby, Sharp, Quinby & Tweedt for Appellant.

Andersen & Resner, George R. Andersen and Herbert Resner for Respondent.

TRAYNOR, J.—Plaintiff brought this action for damages for the harm to his fishing boat "San Giuseppe" resulting from a collision with a car float bearing thirteen railroad cars towed by defendant's tug "Sea Rover." The action was tried before a jury. Defendant appeals from a judgment awarding plaintiff $2,000 damages and from an order denying a motion for a new trial.

Plaintiff left Fisherman's Wharf in San Francisco alone in his fishing boat about 4:30 a.m., half an hour before the collision, and proceeded in a westerly direction. The boat displayed running lights. Since the night was clear there was good visibility, and an ebb tide favored plaintiff's movement. About ten minutes after leaving Fisherman's Wharf, plaintiff stopped his engine because of air in the fuel line. He testified that before working on the engine he looked around to see whether any other craft were in sight; that he did not see defendant's tug and car float; that he worked to clear the fuel line for about five or six minutes and then started the engine; that he then saw the car float 25 to 30 feet away and crashed into her bow because he could not change his course effectively at that distance. He claims that he heard no warning whistles and that when he called for help, as his boat was getting away from the car float under its own power, he received no response from defendant's tug or car float. With the assistance of another fishing boat plaintiff's boat reached

the entrance of Fisherman's Wharf where it sank. It was subsequently raised and repaired.

Captain Edwards of defendant's tug "Sea Rover" testified that he left Tiburon about 4:10 a. m. bound for Pier 45, San Francisco, proceeding generally east by south; that he was standing on the tug's pilot house where he had an unobstructed view; that he observed plaintiff's boat and another fishing boat as they cleared Pier 45 and came into the bay; and that he continued to watch the two boats until the collision occurred. According to Captain Edwards, the collision occurred about a quarter of a mile from Aquatic Park; plaintiff fixed it at about 250 yards from the Yacht Harbor. Captain Edwards also testified that he blew one whistle when he was about a quarter of a mile from plaintiff's boat to indicate that he was going to change his course to the right in order to pass plaintiff on the port side; that since plaintiff did not answer or change his course, he gave the danger signal, a series of short blasts; and that when plaintiff continued on on his course he gave the order to stop and reverse the tug so that the car float was at a standstill when plaintiff's vessel crashed into it. After the collision he called to plaintiff but received no answer from him, although the other fisherman who was near plaintiff's boat called back that he would try to ascertain plaintiff's condition. Captain Edwards testified that he did not see that one fishing boat left in tow of the other, and that he proceeded on his course under the impression that no damage had been done. He reported the collision to his employers, but not to the United States Steamboat Inspector.

Plaintiff's damages consisted of expenses incurred in repairing his boat and replacing the engine and nets, and of loss of earnings. The jury's verdict was for only part of the damages, indicating that it found both parties at fault. It was instructed to apply section 292 (c) of the California Harbors and Navigation Code, which provides that if both parties to a ship collision are at fault "the loss shall be equally divided, unless it appears that there was great disparity in fault, in which case the loss shall be equitably apportioned."

Plaintiff's claim arises from a collision on navigable waters of the United States and thus involves a maritime cause of action (*United States* v. *Appalachian Elec. Power Co.*, 311 U.S. 377 [61 S.Ct. 291, 85 L.Ed. 243]), which in a federal

court sitting as a court of admiralty would be determined under federal maritime law. (*Waring* v. *Clarke,* 5 How. (46 U.S.) 441, 459 [12 L.Ed. 226] ; *The Genessee Chief* v. *Fitzhugh* 12 How. (53 U.S.) 443 [13 L.Ed. 1058] ; *Grant Smith-Porter Ship Co.* v. *Rohde,* 257 U.S. 469, 476 [42 S.Ct. 157, 66 L.Ed. 321] ; *Martin* v. *West,* 222 U.S. 191, 197 [32 S.Ct. 42, 56 L.Ed. 159].) The federal maritime law provides for equal division of damages, if both parties were at fault, even though there was a disparity in fault. (*The Marian,* 66 F.2d 354 ; *The Margaret,* 30 F.2d 923, 928 and cases there cited.) Jurisdiction of the state court to try the action is based on section 24(3) of the Judicial Code, 28 U.S.C.A. section 41(3), which "in all civil cases of admiralty and maritime jurisdiction" saves to suitors "the right of a common law remedy where the common law is competent to give it." The remedy afforded in the state court may be invoked to secure such rights "as readily admit of assertion and enforcement in actions *in personam* according to the course of the common law." (*Panama R. Co.* v. *Vasquez,* 271 U.S. 557, 561 [46 S.Ct. 596, 70 L.Ed. 1085] ; see *Moore* v. *Purse Seine Net,* 18 Cal.2d 835, 837 [118 P.2d 1] ; *C. J. Hendry Co.* v. *Moore,* 318 U.S. 133 [63 S.Ct. 499, 87 L.Ed. 663].) Plaintiff's action is in personam to recover damages for tort and is "one of the most familiar of the common law remedies." (*Panama R. Co.* v. *Vasquez, supra.*) "That there always has been a remedy at common law for damages by collision at sea cannot be denied." (*Schoonmaker* v. *Gilmore,* 102 U.S. 118, 119 [26 L.Ed. 95].) Since contributory negligence generally precludes a plaintiff from recovering damages at common law, defendant contends that the doctrine of contributory negligence is part of the common-law remedy and is therefore binding on a state court in a maritime cause as a limitation of the court's jurisdiction.

Defendant relies on *Belden* v. *Chase,* 150 U.S. 674 [14 S.Ct. 264, 37 L.Ed. 1218], in which the United States Supreme Court held that contributory negligence of the plaintiff would bar recovery in an action on a maritime collision in a state court. Other courts, including this court in an early decision, have reached the same conclusion. (*Kelly* v. *Cunningham,* 1 Cal. 365, 367 ; *Maleeny* v. *Standard Shipbuilding Corp.,* 237 N.Y. 250 [142 N.E. 602] ; *Smith* v. *Norfolk & S. R. Co.* 145 N.C. 98, 99 [58 S.E. 799, 122 Am. St. Rep. 423] ; *Steiner* v. *Mississippi River etc. Co.,* 194 Iowa 647 [190 N.W. 9, 25

A.L.R. 1551]; *Johnson* v. *United States Shipping Board etc. Corp.*, 24 F.2d 963; *Puget Sound Nav. Co.* v. *Nelson*, 41 F.2d 356; *Wolker* v. *Electric Ferries Inc.*, 82 F.2d 1023.) These courts have sometimes stated that general principles of law would require a different conclusion. (*In re Pennsylvania R. R. Co.*, 48 F.2d 559, 566; *Wilkins* v. *Foss Launch etc. Co.*, 20 Wn.2d 422 [147 P.2d 524]; see Sprague, Divided Damages, 6 N.Y.U.L. Rev. 14.)

Subsequent decisions of the United States Supreme Court, however, compel the conclusion that *Belden* v. *Chase, supra,* is no longer a binding precedent. The sole basis for the holding in *Belden* v. *Chase* is a dictum in *Atlee* v. *Northwestern U. Packet Co.*, 21 Wall. (88 U.S.) 389, 395 [22 L.Ed. 619], that admiralty courts and common-law courts have their own set of rules for determining the effect of the fault of both parties in a collision case and that the applicability of either sets of rules depends on the forum selected by the plaintiff. Under this theory, the special rules of admiralty practice with respect not only to remedial but to substantive rights would apply only if the suit were brought in a court of admiralty. This theory has been repudiated in later cases. It is now settled that "The general rules of the maritime law apply whether the proceeding be instituted in an admiralty or common law court." (*Carlisle Packing Co.* v. *Sandanger*, 259 U.S. 255, 259 [42 S.Ct. 475, 66 L.Ed. 927]; *Chelentis* v. *Luckenbach S. S. Co.*, 247 U.S. 372, 380-381 [38 S.Ct. 501, 62 L.Ed. 1171]; *Knickerbocker Ice Co.* v. *Stewart*, 253 U.S. 149, 159 [40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145]; *Engel* v. *Davenport*, 271 U.S. 33 [46 S.Ct. 410, 70 L.Ed. 813]; *Panama R. Co.* v. *Vasquez*, 271 U.S. 557 [46 S.Ct. 596, 70 L.Ed. 1085]; *Messel* v. *Foundation Co.*, 274 U.S. 427, 434 [47 S.Ct. 695, 71 L.Ed. 1135]), and that the state courts must preserve all substantial admiralty rights of the litigants. (*Garrett* v. *Moore-McCormack Co.*, 317 U.S. 239, 249 [63 S.Ct. 246, 87 L.Ed. 239]; *Messel* v. *Foundation Co.*, 274 U.S. 427, 434 [47 S.Ct. 695, 71 L.Ed. 1135].) A state court having the same jurisdiction over a case that a federal court would have if the suit had been brought there, must determine the rights of the parties under the maritime law as a "system of law coextensive with, and operating uniformly in, the whole country." (*The Lottawanna*, 21 Wall. (88 U.S.) 558, 575 [22 L.Ed. 654]; *Southern Pacific Co.* v. *Jensen*, 244

U.S. 205, 215 [37 S.Ct. 524, 61 L.Ed. 1086]; *Chelentis* v. *Luckenbach S. S. Co.*, *supra*, p. 382; *Knickerbocker Ice Co.*, v. *Stewart*, 253 U.S. 149, 159 [40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145]; *Carlisle Packing Co.* v. *Sandanger*, 259 U.S. 255, 259 [42 S.Ct. 475, 66 L.Ed. 927]; *Messel* v. *Foundation Co.*, 274 U.S. 427, 434 [47 S.Ct. 695, 71 L.Ed. 1135].) State law is inapplicable to a maritime cause "if it contravenes the essential purpose expressed by an act of Congress or works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." (*Southern Pacific Co.* v. *Jensen*, 244 U.S. 205, 216 [37 S.Ct. 524, 61 L.Ed. 1086]; *Occidental Ind. Co.* v. *Industrial Acc. Com.*, 24 Cal.2d 310, 313 [149 P.2d 841]; *Knickerbocker Ice Co.* v. *Stewart*, *supra*, p. 157.) Thus the common-law defense of assumption of risk is not available in either a state or federal court in a suit brought by a seaman under the Jones Act (41 Stats. 1007, 46 U.S.C.A. § 688; *Paulsen* v. *McDuffie*, 4 Cal.2d 111, 115, 118 [47 P.2d 709]; *Beadle* v. *Spencer*, 298 U.S. 124 [56 S.Ct. 712, 80 L.Ed. 1082]; *The Arizona* v. *Anelich*, 298 U.S. 110 [56 S.Ct. 707, 80 L.Ed. 1075]), nor is contributory negligence a bar to plaintiff's recovery in such a suit. "Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages." (*Socony-Vacuum Oil Co.* v. *Smith*, 305 U.S. 424, 431 [59 S.Ct. 262, 83 L.Ed. 265]; *Beadle* v. *Spencer*, *supra*, p. 131.) Any doubt as to whether the foregoing cases or *Belden* v. *Chase* governs maritime causes in the state courts is dispelled by the Supreme Court's declaration in *Garrett* v. *Moore-McCormack Co.*, *supra*, pages 244-245 that: "In many other cases this Court has declared the necessary dominance of admiralty principles in actions in vindication of rights arising from admiralty law. *Belden* v. *Chase*, 150 U.S. 674 [14 S.Ct. 264, 37 L.Ed. 1218], an 1893 decision which respondent relies upon as establishing a contrary rule, has never been thus considered in any of the later cases cited."

*Garrett* v. *Moore-McCormack Co.*, *supra*, involved a suit by a seaman against his master in a state court to recover

damages for injury under the Jones Act and for maintenance
and cure under the general maritime law. With respect to
both the statutory and the nonstatutory cause of action, the
court held controlling the rule of the general maritime law
with respect to the validity of a release of claims of a seaman
against his master that "the responsibility is on the defendant
to sustain a release rather than on the plaintiff to overcome
it," and reversed the state court, which had applied the
state rule requiring proof by the plaintiff beyond a reason-
able doubt. "The right of petitioner to be free from the
burden of proof imposed by the Pennsylvania local rule in-
hered in his cause of action. Deeply rooted in admiralty as
that right is, it was a part of the very substance of his claim
and cannot be considered a mere incident of a form of proce-
dure." (P. 249.) In pronouncing the rule that state law
cannot be applied in a maritime cause if it would substantially
impair a right arising under federal maritime law, the court
declared: "The source of the governing law applied is in the
national, not the state, governments. If by its practice the
state court were permitted substantially to alter the rights of
either litigant, as those rights were established in federal law,
the remedy afforded by the state would not enforce, but would
actually deny, federal rights which Congress, by providing
alternative remedies, intended to make not less but more
secure . . . admiralty courts, when invoked to protect rights
rooted in state law, endeavor to determine the issues in accord-
ance with the substantive law of the State. So here, in try-
ing this case the state court was bound to proceed in such man-
ner that all the substantial rights of the parties under control-
ling federal law would be protected." (P. 245.)

There can be no doubt that the division-of-damages
rule in maritime collision cases involving the fault of both
parties is as binding on the state courts as the federal rule as
to burden of proof with respect to the validity of releases in
suits by seamen for maintenance and cure. The right of a
plaintiff to a division of damages in a maritime collision case
involving the fault of both parties is a substantial right deeply
rooted in admiralty, inherent in his cause of action, and such
a part of the substance of his claim that it "cannot be consid-
ered a mere incident of a form of procedure." It is indeed
an essential and characteristic feature of the substantive law
of admiralty. The very basis of the plaintiff's cause of action,
which is unquestionably a maritime cause of action, would be

destroyed if recovery were denied because of his contributory negligence, for it is only under admiralty law that he has any claim for damages arising from a maritime collision caused by the fault of both parties. If the state court should apply state law rather than admiralty law ''the remedy afforded by the State would not enforce but would actually deny, federal rights which Congress, by providing alternative remedies, intended to make not less but more secure.'' (*Garrett* v. *Moore-McCormack Co., supra*, p. 245.) That the United States Supreme Court regards the plaintiff's right in such a case as a substantial admiralty right clearly appears not only from its abandonment of *Belden* v. *Chase*, but from its references in the Garrett case to state doctrines of contributory negligence and assumption of risk as doctrines that must give way to admiralty principles in actions at law on maritime torts. ''There is no dearth of example of the obligation on law courts which attempt to enforce substantive rights arising from admiralty law to do so in a manner conforming to admiralty practice. Contributory negligence is not a barrier to a proceeding in admiralty or under the Jones Act, and the state courts are required to apply this rule in Jones Act actions. *Beadle* v. *Spencer*, 298 U.S. 124 [56 S.Ct. 712, 80 L.Ed. 1082]. Similarly, state courts may not apply their doctrines of assumption of risk in actions arising under the Act. *The Arizona* v. *Anelich*, 298 U.S. 110 [56 S.Ct. 707, 80 L.Ed. 1075]; *Socony-Vacuum Oil Co.* v. *Smith*, 305 U.S. 424 [59 S.Ct. 262, 83 L.Ed. 265]. State courts, whether or not applying the Jones Act to actions arising from maritime torts, have usually attempted, although not always with complete success, to apply admiralty principles. The federal courts, when treating maritime torts in actions at law rather than in suits in admiralty, have also sought to preserve admiralty principles whenever consonant with the necessities of common law procedure.''

The court cited with approval (317 U.S. 239, 244, note 8) *Colonna Shipyard* v. *Bland*, 150 Va. 349, 358 [143 S.E. 729, 59 A.L.R. 497], as a state court decision applying federal maritime law with respect to the effect of contributory negligence in an action on a maritime tort. In the Colonna Shipyard case a ship carpenter was injured through the negligence of his master. In denying defendant's right to defeat recovery by the defense of contributory negligence, the Virginia Supreme Court of Appeals declared: ''When one suffers an

injury under such circumstances as to be a maritime tort, his rights are fixed by the admiralty law; but he may choose the forum in which to assert those rights. He has his remedy at common law, but his recovery and the precise relief afforded him are determined by the admiralty law which is applied, whether he sues in the common law or the admiralty court. He may pursue his remedy at common law in the state court, but that court must administer the admiralty law. He may select his court, but cannot add to or change his rights which are the same in both forums." (See, also, *United States* v. *Norfolk-Berkley Bridge Corp.*, 29 F.2d 115, 128.) A case holding that contributory negligence is not a bar to a proceeding in admiralty would not be invoked by the United States Supreme Court as an example of the obligation of law courts to enforce substantive rights arising from admiralty law in conformity with admiralty practice, in support of its holding that the same principles applied to the burden of proof in a maritime cause, if the court did not regard the right to divided damages a substantive right arising from admiralty law.

■ Moreover, under accepted principles of conflict of laws the effect of contributory negligence is governed by the law under which the cause of action was acquired rather than by the law of the forum. (*Fitzpatrick* v. *International Ry. Co.*, 252 N.Y. 127, 134 [169 N.E. 112, 68 A.L.R. 801] ; *Shaffer* v. *New York Central R. Co.*, 66 Ohio App. 417 [34 N.E.2d 792] ; Rest., Conflicts of Laws, § 385 ; 2 Beale, Treatise on Conflict of Laws, § 385.1; 11 Am.Jur. Conflict of Laws, § 189, p. 503; Robinson, Admiralty, 860.) "The constant objective of legislation and jurisprudence is to assure litigants full protection for all substantive rights intended to be afforded by the jurisdiction in which the right itself originates. Not so long ago we sought to achieve this result with respect to enforcement in the federal courts of rights created or governed by state law [*Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487)]." (*Garrett* v. *Moore-McCormack Co.*, *supra*, p. 245.) "The fact that a federal right is to be ascertained in a state rather than in a federal court does not make it any less the duty of the court to apply federal law. *Chesapeake & O. R. Co.* v. *Martin*, 283 U.S. 209, 212, 213 [51 S.Ct. 453, 75 L.Ed. 983] ; *Awotin* v. *Atlas Exchange Nat. Bank*, 295 U.S. 209 [55 S.Ct. 674, 79 L.Ed. 1393] ; *Brady* v. *Southern R. Co.*, 320 U.S. 476, 479 [64 S.Ct. 232, 88 L.Ed.

239] and cases cited; *Illinois Steel Co.* v. *Baltimore & O. R. Co.,* 320 U.S. 508, 511 [64 S.Ct. 322, 88 L.Ed. 259] and cases cited; *Steele* v. *Louisville & N. R. Co.,* 323 U.S. 192 [65 S. Ct. 226, 89 L.Ed. ——]." (Chief Justice Stone, concurring in *Prudence Realization Corp.* v. *Ferris,* —— U.S. —— [65 S.Ct. 539, 542, 89 L.Ed. ——].)

■ Federal law governs not only the consequences of the fault of the parties but the question whether their vessels were operated in compliance with the rules governing navigation on navigable waters of the United States. The Federal Inland Rules of Navigation, 30 Stats. 96-102; (33 U.S.C.A. §§ 151-231) are controlling except as they permit the application of special local law. Plaintiff violated the Federal Inland Rules in several respects. While he was repairing his engine he failed to keep a lookout as required by article 29, 30 Stats. 102; 33 U.S.C.A. section 221, and was thus unable to see the tug and car float in time to avoid the collision. He gave no danger signal as required by article 18, rule III, and instead of reducing his speed (*The Pennsylvanian,* 139 F.2d 478, 481) he started his motor just before the collision occurred. Although he was outbound he failed to keep to the starboard side of the channel, which the jury might have regarded as a narrow one within the meaning of article 23, 30 Stats. 101; 33 U.S.C.A., section 210 (*The Bee,* 138 F. 303 [70 C.C.A. 593]; *The Hokendauqua,* 270 F. 270; 28 Words and Phrases, 19.) Although he followed generally a westerly direction, he failed to keep out of the way of defendant's vessels, which followed an east by south direction and were therefore on his starboard side. (Arts. 19, 22, 23; 33 U.S.C.A. §§ 204, 207, 208.)

Defendant contends that it can be determined as a matter of law under the Federal Inland Rules that it was not negligent. The evidence shows without conflict that defendant's vessels proceeded on their course as prescribed by the rules applicable under ordinary circumstances. ■ The question remains, however, whether sometime before the captain of the "Sea Rover" gave the order to stop and reverse the ship, he knew or should have known that he could avoid a collision by stopping his vessels, or by changing his course, for the rules provide, "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid im-

*mediate danger.*'' (Art. 27, 30 Stats. 102; 33 U.S.C.A. § 212.) A case of ''special circumstances'' requiring action outside the rules exists if the danger was manifest to the captain of the vessel faced with the problem of departing from the rules. ''Where two courses are open to a vessel, and particularly to the privileged vessel, one to follow the prescribed rules and the other to depart from them, the duty is imperative to observe the rules, and to assume that an approaching vessel will do likewise, until after the danger has become so manifest as to show that there is no proper choice of judgment other than that of departing from the rules. Any other course would lead to confusion and be a most prolific source of accidents.'' (*The Piankatank,* 87 F.2d 806, 810.) ■ Defendant's vessels were the privileged vessels, for they were on the starboard side of the approaching vessel. (30 Stats. 101; 33 U.S.C.A. § 204.) They had a duty under the Federal Inland Rules to hold their course and speed (30 Stats. 101, 33 U.S.C.A. § 206), while it was plaintiff's duty to keep out of their way. (30 Stats. 101; 33 U.S.C.A. §§ 207, 208.) ■ The decisive question, therefore, is when it became the duty of the captain of the ''Sea Rover'' to stop and reverse his ship or to change his course. ''The preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some *distinct indication* that she is about to fail in her duty.'' (*Wilson* v. *Pacific Mail S. S. Co.,* 276 U.S. 454, 462 [48 S.Ct. 369, 72 L.Ed. 651].) ''The privileged vessel is always in a difficult situation. The rule is that she must keep her course and speed until it becomes apparent that the burdened vessel alone cannot avoid the collision.'' (*The Boston Socony,* 63 F.2d 246, 248.) In the present case the captain of the ''Sea Rover'' watched plaintiff's boat after it cleared Pier 45 of the San Francisco Harbor. Visibility was good. There were indications that the fishing boat was in distress and that it would not follow navigation rules. Although the fishing boat showed running lights, it proceeded at a very slow speed, drifting with the ebb tide for about five or six minutes before the collision. The failure of the fishing boat to change her course or to answer the ''Sea Rover's'' signal that the latter was going to change her course indicated that plaintiff's boat was mismanaged or out of control, and that observance of the navigation rules by plaintiff was not to be expected. The jury could reasonably have concluded that the

captain of the "Sea Rover" should have known that a dangerous situation was developing when its signal indicating a change of course remained unanswered, and that the only safe procedure was not to maintain his course and speed but to stop and reverse the "Sea Rover" or to change his course at once. "The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect. We cannot impress upon the masters of steam vessels too insistently the necessity of caution in passing or crossing the course of other vessels in constricted channels." (*The New York*, 175 U.S. 187, 207 [20 S.Ct. 67, 44 L.Ed. 126].) The captain of the "Sea Rover" should have exercised particular caution, for he did not maintain a special lookout on his vessel as required by article 29 of the Federal Inland Rules. (30 Stats. 102; 33 U.S.C.A. § 221.) A tug with a tow does not comply with this rule simply because the officer in charge looks out from the pilot house. (*City of Philadelphia* v. *Gavagnin*, 62 F. 617, 618 [10 C.C.A. 552]; *The Williamsport*, 74 F. 653, 655 [20 C.C.A. 585]; *Dahlmer* v. *Bay State etc. Co.*, 26 F.2d 603, 605.) ■ Moreover, the captain did not know where the lookout on the tow was located, although he had in tow a barge about 280 feet in length and 40 feet in width. Although ordinarily it is the duty of the other ship to make allowance for the encumbered state of a tug (*The Edward Chilton*, 27 F.2d 624, 625), the captain of a tug with a barge in tow must give consideration to the special danger connected with such a tug in deciding whether the situation was so dangerous that he should stop the tug. As stated in Marsden, Collisions at Sea, ninth edition, page 185: "In taking measures to avoid a third vessel a tug has to consider her tow; and a step that would be right, and take her clear, if he were unencumbered, may bring about a collision between her tow and the ship which she herself has avoided."

■ Defendant attempts to meet these considerations by asserting that under the rule known as the "major and minor fault rule" any reasonable doubt as to its negligence had to be resolved in its favor. The rule has recently been restated and its limitations defined as follows: "It is well settled law that 'where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient

to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor.' *Alexandre* v. *Machan* (*The City of New York*), 1893, 147 U.S. 72, 85 [13 S.Ct. 211, 37 L.Ed. 84]. Accord, *The Victory* (*The Plymothian*), 1897, 168 U.S. 410, 423 [18 S.Ct. 149, 42 L.Ed. 519]; *The Ludvig Holberg*, 1895, 157 U.S. 60 [15 S.Ct. 477, 39 L.Ed. 620]; *The San Simeon*, 2 Cir., 1933, 63 F.2d 798. However, this court long ago said that this rule that where one vessel was guilty of gross fault, the other is presumed not to have been in fault, was artificial and misleading unless very carefully applied. *The Admiral Schley*, 1 Cir., 1904, 131 F. 433, 439, affirmed on rehearing, 1 Cir. 1905, 142 F. 64, certiorari denied, sub. nom. *Consolidation Coal Co.* v. *American Mail Steamship Co.*, 1906, 201 U.S. 648 [26 S.Ct. 762, 50 L.Ed. 905]. Even though the first vessel is grossly at fault, a plain fault on the part of the other vessel is not excused. *The Albert Dumois*, 1900, 177 U.S. 240, 253 [20 S.Ct. 595, 44 L.Ed. 751]; *The Yamashita Kisen Kabushiki Kaisha* v. *McCormick Inter. S. S. Co.*, 9 Cir. 1927, 20 F. 2d 25; *The San Simeon, supra.*" (*General Seafoods Corp.* v. *J. S. Packard Dredg. Co.*, 120 F.2d 117, 119.) The major and minor fault rule must give way to the well-settled rule of maritime law that if one vessel, though correctly navigated some time before the collision, can perceive that a dangerous situation is developing through mismanagement of another vessel it becomes her duty with all means at her disposal to prevent the accident and that "the fault, and even the gross fault of one vessel, does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require." (*The Albert Dumois*, 177 U.S. 240, 253 [20 S.Ct. 595, 44 L.Ed. 751]; *The New York*, 175 U.S. 187, 207 [20 S.Ct. 67, 44 L.Ed. 126]; *The Yamashita etc. Kaisha* v. *McCormick etc. Co.*, 20 F.2d 25, 27; *The San Simeon*, 63 F.2d 798, 800; *The Trim*, 30 F.Supp. 283; *General Seafoods Corp.* v. *J. S. Packard Dredg. Co., supra,* p. 119; see Inland Rules, article 29, 30 Stats. 102; 33 U.S.C.A. § 221.)

Defendant contends that several instructions to the jury were prejudicially erroneous. It objects to certain instructions on the ground that they had no support in the evidence. The jury was instructed as to the legal consequences

of confused signals by both vessels, although the evidence uniformly showed that all signals were given by the defendant. The jury was instructed as to the obligation of a vessel to avoid risk of collision with vessels at rest, although plaintiff's vessel, since it moved with the ebb tide, was never at rest. The jury was instructed that "a custom to the contrary cannot relieve a towing tug from the legal duty to maintain a proper lookout," although defendant did not claim that there was such a custom. These instructions on hypothetical facts were apt to be confusing.

 The jury was instructed that "a tug must keep a lookout at the bow of the tow alongside, where the tow projects beyond the tug. If in this case, you find from a preponderance of the evidence that the tug failed to keep a lookout in the bow of the barge, and that such failure proximately caused the collision then the defendant is liable." By instructing the jury that a lookout must be stationed at a particular place on the tow, the court invaded the province of the jury. There is no rule that the lookout must be stationed at a particular place; his station should be where he is in a "position best adapted to descry vessels approaching at the earliest moment." (Inland Rules, art. 29, 30 Stats. 102; 33 U.S.C.A. § 221; *The Catalina*, 95 F.2d 283, 285; *Puratich* v. *United States*, 126 F.2d 914, 916; *St. John* v. *Paine*, 10 How. (51 U.S.) 557, 585 [13 L.Ed. 537]; *The Pennsylvania*, Fed.Cas., No. 10949; *The A. P. Skidmore*, 108 F. 972; *The Patria*, 92 F. 411; *Yamashita etc. Kaisha* v. *McCormick etc. Co.*, 20 F.2d 25, 29.)

 The formula instruction with respect to the effect of the disabled condition of plaintiff's vessel was not erroneous in omitting the element of contributory negligence, for the reasons given above; but it was incomplete in omitting any reference to plaintiff's duty to indicate the disabled status of his vessel by giving danger signals or other distress signals. (30 Stats. 100, 102; 33 U.S.C.A. §§ 203, 231.)

 Defendant also attacks the following instruction: "Whenever a collision between two vessels takes place, it is the duty of the master or person in charge of each vessel, so far as consistent with safety, to stay by the other to ascertain if she is in need of assistance, and render such aid as may be requisite and give the name and port of the vessel. Failure to do this, without reasonable cause shown, may raise a presumption that the collision was caused by his wrongful act,

neglect, or default. The fact that a vessel, apprised of the collision, goes on without any attempt to render assistance is to be regarded as a suspicious circumstance." This instruction was based on section 367 of 33 U.S.C.A., 26 Stats. 425, which provides that under the circumstances described in the instruction, it is the duty of the master of each vessel "to render to the other vessel, her master, crew, and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master or person in charge of the other vessel the name of his own vessel and her port of registry. . . . If he fails so to do, and no reasonable cause for such failure is shown, the collision shall in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect or default." The instruction provides that a vessel shall "render such aid as may be *requisite*" whereas the statute provides that the vessel shall render "such assistance as may be *practicable* and as may be necessary." Although "requisite" may be the fair equivalent of "necessary," it is not the equivalent of "practicable," for it may not be "practicable" to render the necessary aid. The instruction also omitted the condition, "in the absence of proof to the contrary." These omissions rendered the instruction incomplete.

The court gave the following instruction: "The fact that a tug is burdened with a heavy and unwieldly tow imposes on the tug the duty of taking extraordinary care to keep her tow out of the way of other vessels." There is no such rule. It is established that as between vessels otherwise equal, a tug with a tow has the right of way over a vessel without a tow. (*The Edward Chilton*, 27 F.2d 624, 625.) The cumulative effect of the foregoing instructions and those considered below was to confuse the jury as to the real issues and the law governing the duties of vessels at sea.

The instructions were conflicting on substantial matters. On the question as to the proper conduct of vessels approaching on crossing courses, the jury was instructed in terms of section 284 of the California Harbors and Navigation Code: "When steam vessels will inevitably or necessarily cross so near that by continuing their respective courses there would be risk of collision, each shall give right rudder, so as always to pass on the port or left side of the other." On the same question the jury was also instructed in the terms of the

Federal Inland Rules (30 Stats. 101; 33 U.S.C.A. §§ 204, 207, 208) that "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her starboard or right side shall keep out of the way of the other." "Every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case admit, avoid crossing ahead of the other." "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary slacken her speed or reverse." The giving of conflicting instructions on this vital issue was prejudicial error. (*Pipoly* v. *Benson*, 20 Cal.2d 366, 369 [125 P.2d 482, 147 A.L.R. 515]; *Pittam* v. *City of Riverside*, 128 Cal.App. 57 [16 P.2d 768]; *Torvend* v. *Patterson*, 136 Cal.App. 120, 124 [28 P.2d 413].) Moreover, the instruction under the California code section was in itself erroneous, for the federal rules are paramount. In the light of the evidence in this case we cannot say that it is improbable that the jury found defendant negligent because it failed to give right rudder in accordance with the California code section. ▮▮▮ Furthermore, the instruction on the applicable federal rules was incomplete, for the court refused to give an instruction requested by defendant based on the Federal Inland Rules (30 Stats. 101; 33 U.S.C.A. § 206) that "where by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed." The pivotal question in the case is whether the captain of the "Sea Rover" should have stopped and reversed the tug or changed his course in time to prevent an otherwise inevitable collision. The jury had to be properly instructed with respect to the captain's duties in this regard before it could determine the question of his negligence. The failure of the court to instruct the jury that the "Sea Rover" had to maintain her course and speed until the danger of collision became manifest, and was then under a duty to take all reasonable action to prevent a collision, left the jury without the governing standard by which to measure defendant's negligence. While we cannot say as a matter of law under the evidence in this case that a reasonable jury could not conclude that the captain of the "Sea Rover" failed to stop and reverse the tug or to change his course after the danger of collision became manifest and in time to avoid the collision, neither can we say it is improbable that under proper instructions the jury would have reached a different conclusion.

The judgment is reversed and the appeal from the order denying the motion for new trial is dismissed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment. I agree with the holding of the majority opinion that the federal maritime law governs the cause of action and that the evidence is not insufficient, as a matter of law, to support a finding of negligence on the part of plaintiff as well as on that of the operator of defendant's tugboat. Where both vessels are at fault the damages are to be equally divided, irrespective of the degree of fault. (*The Marian* (1933), 66 F.2d 354, 357.) Since the damages were not equally divided here but were apparently assessed upon the theory of apportioning the loss in accordance with the fault, the judgment must be reversed.

Both plaintiff's and defendant's vessels were under way at all times concerned (see Preliminary Definitions, paragraph I, Inland Rules) but there is a conflict in the evidence as to whether, up to a few moments before the collision, plaintiff's vessel was under command and was making way through the water. According to plaintiff his boat had not been under command and had not been making way through the water for some five or six minutes prior to the time when the barge had approached within 25 or 30 feet of him. But the master of defendant's tug testified that he had watched plaintiff continuously during the closing of a gap of at least one-quarter of a mile; that plaintiff had "held his course and speed"; that before the collision the tug with its tow had lost way completely and that it was plaintiff's boat which ran into the barge.

Regardless of all other rules which may have been involved it is obvious that plaintiff could be found, either upon his own testimony or upon that of defendant's master, to have been guilty of negligence in failing to keep a proper lookout for approaching vessels. Likewise upon the testimony of either plaintiff or the tug's master it could be found that the latter was inattentive or unskillful or otherwise negligent in bringing his cumbersome and unwieldy tow so close to plaintiff's boat as to involve immediate risk of collision under any of the circumstances shown. If plaintiff's boat was not under command that fact should have been apparent to an experienced,

competent, and attentive officer in the pilot house of defendant's tug in ample time to have permitted avoidance of the collision and if, on the other hand, plaintiff's boat was under command and making way through the water then it would seem to be a reasonable inference that the master of the tug was negligent in not having sooner recognized, or acted upon the fact, that risk of collision was involved in the holding of course and speed by both the tow and plaintiff's boat after the latter had failed to answer a crossing signal which called for it to cross the bow of the tow from starboard to port and where its compass bearing remained constant.

I do not see how the instruction quoting section 284 of the California Harbors and Navigation Code could possibly have prejudiced the defendant. According to the master of defendant's tugboat he sounded one blast of the whistle calling for each boat to alter her course to starboard and to leave the other to port. This is in accord with the California code rule as well as with rule I of article 18 of the Inland Rules. It does not necessarily appear, however, that the situation was controlled by such rule I.

Rule I of article 18 applies to passing vessels, that is, to vessels "approaching *each other* [italics added] head and head . . . or nearly so. . . . It does not apply by day to cases in which a vessel sees another ahead crossing her own course, or by night" where the same relative positions are shown by the running lights. It was the latter situation which almost certainly was present here. Plaintiff's boat was coming from Fisherman's Wharf, from the vicinity of Pier 45. Defendant's tow was coming from Tiburon on a course to dock at Pier 45 against an ebb tide. Necessarily, until they had crossed, plaintiff's boat was to starboard of defendant's tug and barge, and, as was to be expected, that is where the master of the tug said that he first saw plaintiff's boat. He said that he saw several fishing boats on his starboard side, "well inside, towards Aquatic Park" and that plaintiff's boat was one of two which "steered in such a direction as to cross my bow." At that time a distance of about one-half mile separated plaintiff's boat and defendant's tow. Plaintiff under article 19 (Inland Rules) had the right of way. "When two steam vessels₀ [under the statutory definition both plaintiff's boat and defendant's tug were "steam vessels"] are crossing, so as to involve risk of collision, the vessel which has the

other on her own starboard side shall keep out of the way of the other.''

Apparently, it was at about the time that plaintiff's boat reached a position nearly dead ahead of the tow that plaintiff's engine stopped. Either his engine stopped or he altered his course from a crossing course to a passing course. In either event it is obvious that his angle on the bow of defendant's craft ceased to change and the preliminary provision of the Steering and Sailing Rules became applicable. That provision is (Inland Rules, § IV) : ''Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist.'' The master of the tug apparently recognized this risk when the boats were about one-quarter mile from each other. He testified that he first signaled the fishing boat when they were ''a good quarter of a mile'' apart. He said, ''When I saw that he had not altered his course [apparently meaning compass bearing], when I blew this one whistle, then naturally I gave orders to the men to come to the right.''

The one blast of the whistle called for plaintiff to cross the bow of defendant's tow so that the vessels would cross or pass port to port. That signal was not answered. The failure to answer it, coupled with no change in compass bearing, should at once have been recognized as evidencing ''risk of collision.'' Prompt action by defendant's master, at the distance then separating the vessels, it would seem, could have averted the collision.

Although certain instructions were erroneous I do not believe that any of the instructions complained of were prejudicially erroneous except insofar as they authorized the jury to equitably apportion the loss if they found ''that there was a great disparity in fault.'' As it is obvious that the jury did undertake to equitably apportion the loss the judgment cannot stand.

For the above stated reasons only I concur in the judgment of reversal.

Appellant's petition for a rehearing was denied June 21, 1945.